**UNITED STATES of America,**

v.

**Yahya GOBA, Shafal Mosed, Yasein Taher, Faysal Galab, Mukhtar Al-Bakri and Sahim Alwan, Defendants.**

No. 02–CR–214S.

United States District Court, W.D. New York.

Jan. 16, 2003.

Sean Dennis Hill, Hill & McCready, Buffalo, NY, William Clauss, Federal Public Defender, Rochester, NY, for Yahya Goba.

Sean Dennis Hill, Hill & McCready, Buffalo, NY, James P. Harrington, Harrington and Mahoney, Buffalo, NY, for Sahim Alwan.

Patrick J. Brown, LoTempio & Brown, Buffalo, NY, Sean Dennis Hill, Hill & McCready, Buffalo, NY, for Shafal Mosed.

Sean Dennis Hill, Hill & McCready, Buffalo, NY, Rodney O. Personius, Personius Melber LLP, Buffalo, NY, for Yasein Taher.

Sean Dennis Hill, Hill & McCready, Buffalo, NY, Joseph M. LaTona, Buffalo, NY, for Faysal Galab.

John J. Molloy, West Seneca, NY, Sean Dennis Hill, Hill & McCready, Buffalo, NY, for Mukhtar Al-Bakri.

## DECISION AND ORDER

SKRETNY, District Judge.

### I. INTRODUCTION

Defendants Yahya Goba, Shafal Mosed, Yasein Taher and Mukhtar Al-Bakri are presently detained pending trial pursuant to an order issued by United States Magistrate Judge H. Kenneth Schroeder, Jr. on October 8, 2002. Currently before me are motions filed on behalf of Defendants Goba, Mosed, Taher and Al-Bakri for revocation of the detention order.[1]

As discussed more fully below, I will deny Defendants' motions. In doing so, I find that the charged offense, 18 U.S.C.

---

1. This Court has reviewed and considered the following pleadings submitted in support of and in opposition to Defendants' Motions for Revocation: Defendants Goba, Mosed and Taher's Motion for Revocation (Docket No. 39), Defendants' Supplemental Affirmation in Support (Docket No. 46), Defendant Mosed's Motion Seeking Review of Detention Order (Docket No. 57), Defendant Al-Bakri's Motion to Review Detention Order (Docket No. 58), Affidavit of William Clauss, Esq. in Support of Defendant Goba's Motion for Revocation (Docket No. 60), Defendants' Joint Memorandum in Support (Docket No. 61), Defendant Taher's Memorandum in Support (Docket No. 62), Government's Memorandum in Opposition to Defendants' Motion for Revocation (Docket No. 69), Defendant Taher's Reply Memorandum in Support (Docket No. 74), Defendant Goba's Reply Memorandum in Support (Docket No. 75) and Defendant Mosed's Reply Memorandum in Support (Docket No. 76).

§ 2339B, is a "crime of violence," and that the Government has demonstrated by clear and convincing evidence that Defendants pose a danger to the community. Significantly, the Government has produced credible evidence that each defendant associated himself with al-Qaeda, a designated terrorist organization with the avowed aim of inflicting death and destruction on American citizens and interests. In reaching my decision, I note that the express purpose of a terrorist training camp such as al-Farooq is to make its participants more dangerous (and thus more useful to the terrorist group) than they were before they received the training. Given the well-known modus operandi of terrorist organizations such as al-Qaeda, the stated goals of Usama bin Ladin, and the evidence regarding the type of training that each Defendant received while at the camp, I find that no release condition or combination of release conditions will adequately safeguard the community.

In addition, I find that the Government has proven by a preponderance of the evidence that each defendant poses a risk of flight if released. The Government proffered evidence indicating that each defendant has the ability to sustain himself abroad, either with his own resources or through the use of an international support network. This ability, combined with Western New York's proximity to the Canadian border and the potential period of incarceration faced by each defendant, is sufficient to establish that no release condition or combination of conditions will assure the continued appearance of these Defendants.

Therefore, Defendants Goba, Mosed, Taher and Al-Bakri shall remain detained pending trial.

With respect to the other two defendants in this case, Faysal Galab and Sahim Alwan, it should be noted that Defendant Galab's detention will continue following a plea agreement executed on January 10, 2003. Further, although Defendant Alwan is subject to pretrial release on conditions, he has not yet applied for release and I have issued a stay of his release pending resolution of a motion for reconsideration filed by the Government on January 13, 2003.

## II. BACKGROUND

On October 21, 2002, a federal Grand Jury in the Western District of New York indicted each of the above-captioned defendants on two counts of violating 18 U.S.C. §§ 2339B and 2. Count One charges each defendant with conspiring to knowingly provide material support and resources to al-Qaeda, a foreign terrorist organization, in violation of 18 U.S.C. § 2339B. Count Two charges each defendant with the substantive offense of knowingly and unlawfully providing material support and resources to al-Qaeda, in violation of 18 U.S.C. §§ 2339B and 2.[2]

Briefly, the Government alleges that during the spring and summer of 2001, Defendants traveled in two separate groups from the United States to Pakistan, and from Pakistan to Afghanistan, where they attended an al-Qaeda terrorist training camp. Defendants allegedly received firearms and other tactical training, underwent anti-American and anti-Israeli indoctrination, were lectured on martyrdom and the justification for using suicide as a weapon, and attended a speech personally given by Usama bin Ladin that, in part, emphasized the need to prepare and train for a "fight against the Americans." After

2. Prior to the Grand Jury's Indictment, Defendants had been charged in two separate criminal Complaints: one encompassing Defendants Goba, Mosed and Taher, and another covering Defendant Al-Bakri.

several weeks, Defendants left the camp and returned to Lackawanna, New York. All resumed their regular lives until their arrests on or about September 13, 2002.

At their initial appearances after their arrests, the Government moved for the pretrial detention of each defendant.[3] Defendants opposed the Government's motion, prompting Judge Schroeder to conduct a single, comprehensive detention hearing that ultimately spanned the course of four days—September 18, 19 and 20, 2002, and October 3, 2002. Defendants were present and represented by assigned counsel during the hearing, at which the Government and Defendants proceeded by way of proffer with exhibits.

On October 8, 2002, Judge Schroeder issued a widely publicized Decision and Order granting the Government's Motion to Detain in part and denying it in part. *United States v. Goba*, 220 F.Supp.2d 182 (W.D.N.Y.2002). Attached to Judge Schroeder's Decision and Order is a twenty-six page synopsis of the proof offered by the Government and Defendants during the hearing. *See id.* at 196–223. Neither the Government nor Defendants have submitted any new information or evidence to supplement that which was presented during the detention hearing. Thus, the record developed before Judge Schroeder constitutes the complete record of Defendants' detention proceedings. Familiarity with Judge Schroeder's Decision and Order and the accompanying attachment is presumed.

Shortly after Judge Schroeder issued his Decision and Order, Defendants filed motions for revocation with this Court. At a status conference on October 28, 2002, I accepted the parties' jointly proposed briefing schedule, which culminated in oral argument on the motions on December 30, 2002. Upon completion of oral argument, I deemed Defendants' motions submitted and took the matters under advisement.

## III.  DISCUSSION and ANALYSIS

### A.  Standard of Review

Eighteen U.S.C. § 3145(b) provides the mechanism by which a defendant may seek review of a magistrate judge's pretrial detention order by a district judge having original jurisdiction over the matter. Defendants properly invoked this review procedure by timely filing the instant motions for revocation as provided for in § 3145(b).

Having received Defendants' motions, this Court must conduct a *de novo* review of Judge Schroeder's detention order. *See United States v. Leon*, 766 F.2d 77, 80 (2d Cir.1985); *United States v. Marra*, 165 F.Supp.2d 478, 481 (W.D.N.Y. 2001). Under this review standard, this Court will judge the issues anew, but in doing so, utilize the factual and evidentiary record developed during the detention hearing before Judge Schroeder. However, as is required under *de novo* review, this Court will reach its own independent findings of fact and conclusions of law. *See Leon*, 766 F.2d at 80 (finding that on *de novo* review, a district court "should not simply defer to the judgment of the magistrate, but reach its own independent conclusion").

### B.  Bail Reform Act Overview

Under the Bail Reform Act, 18 U.S.C. §§ 3141, *et seq.*, pretrial detention is available only pursuant to § 3142(e).[4] *See* 18 U.S.C. § 3142(a)(4); *United States v. Dillard*, 214 F.3d 88, 90–91 (2d Cir.2000).

---

**3.**  Defendants Goba, Mosed and Taher initially appeared on their criminal Complaint on September 14, 2002; Defendant Al–Bakri initially appeared on his criminal Complaint on September 16, 2002.

**4.**  This Court notes that the provisions of the Bail Reform Act have withstood constitutional scrutiny. *See, e.g., United States v. Salerno*, 481 U.S. 739, 755, 107 S.Ct. 2095, 2105–06, 95 L.Ed.2d 697 (1987)(rejecting Fifth Amend-

That subsection expressly authorizes the pretrial detention of a defendant upon a judicial finding that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e).

Pretrial detention under § 3142(e), however, must be predicated on at least one of the six categories or entry points enumerated in § 3142(f). Satisfaction of any category triggers a mandatory detention hearing before a judicial officer. See 18 U.S.C. § 3142(f). Three of the categories, §§ 3142(f)(1)(A)-(C), are based on the nature of the charged offense, including the potential term of incarceration; § 3142(f)(1)(D) is based on the nature of the charged offense and the defendant's prior criminal record; and the final categories, §§ 3142(f)(2)(A) and (B), are based on whether there is a serious risk that the defendant will either flee, or obstruct justice or threaten a prospective witness or juror. See Dillard, 214 F.3d at 91; see also 18 U.S.C. § 3142(f). It is the government's burden to prove by a preponderance of the evidence that the defendant falls into one or more of the six categories. See United States v. Friedman, 837 F.2d 48, 49 (2d Cir.1988) (per curiam).

■ Assuming satisfaction of one of the six entry points, the court must next examine the factors set forth in § 3142(g) in connection with its determination as to whether any condition or combination of conditions set forth in § 3142(c) will reasonably assure the defendant's appearance and the safety of other persons and the community. See 18 U.S.C. §§ 3142(c) and (g); see also Friedman, 837 F.2d at 49. In this regard, the Government must establish risk of flight by a preponderance of the evidence, see United States v. Jackson, 823 F.2d 4, 5 (2d Cir.1987), or danger to others and the community by clear and convincing evidence, see United States v. Ferranti, 66 F.3d 540, 542 (2d Cir.1995).[5]

### C. Defendants' Points of Argument

Defendants' points of argument can be distilled into five distinct areas: (1) the Government improperly proceeded by proffer, (2) 18 U.S.C. § 2339B is not a "crime of violence," (3) Defendants are not flight risks, (4) Defendants are not dangers to the community, and (5) there are conditions that this Court could impose to assure each defendant's future appearance and the safety of the community.[6] Each point will be discussed in turn.

#### 1. Proceeding by Proffer

■ The Bail Reform Act sets certain parameters within which detention pro-

---

ment Due Process and Eighth Amendment Excessive Bail challenges to the Bail Reform Act).

**5.** Under certain circumstances set forth in § 3142(e), a rebuttable presumption arises that no set of conditions will assure the defendant's appearance and the safety of others and the community. None of the circumstances giving rise to this presumption are present in this case. Moreover, this Court understands that § 3142(e) permits consideration of dangerousness to "the safety of any other person" along with the safety of the community. Here, however, there is no contention that any one individual may be at risk

if Defendants are released. Accordingly, this Court will only discuss dangerousness as it relates to the community as a whole.

**6.** In their pleadings, and to a limited degree at oral argument, Defendants also argue that Judge Schroeder erred in several material respects in reaching his decision. On de novo review, however, it is unnecessary for this Court to determine whether Judge Schroeder committed any of the errors Defendants ascribe to him. Rather, this Court is required to make its own independent findings, rendering the issue of whether Judge Schroeder erred immaterial.

ceedings must be held. For example, it requires that any detention hearing be held immediately upon the defendant's initial appearance and that the defendant be afforded an opportunity to testify, present witnesses, cross-examine witnesses, and present information by way of proffer or otherwise. 18 U.S.C. § 3142(f). Generally though, detention proceedings are informal: the Federal Rules of Evidence do not apply, and the Government is held to burdens of proof less than the customary criminal burden of proof beyond a reasonable doubt. *See id.*

The Bail Reform Act remains silent, however, regarding how the Government must proceed in satisfaction of its burdens. In this Circuit it is well established that the Government may, at a minimum, proceed by way of proffer, just as the defendant is permitted to do under § 3142(f). *See United States v. LaFontaine,* 210 F.3d 125, 131 (2d Cir.2000); *United States v. Martir,* 782 F.2d 1141, 1145 (2d Cir.1986).

This seemingly low threshold is consistent with the informal nature of detention proceedings and the desire to keep them from morphing into "mini-trials," yet tempered by the court's obligation to ensure the reliability of proffered information. *See Martir,* 782 F.2d at 1145 (detention proceedings should not resemble "mini-trials"); *LaFontaine,* 210 F.3d at 131 (courts must ensure the reliability of evidence). Whether presented by proffer or direct evidence, courts retain the responsibility for assessing the accuracy of the Government's proof. *Martir,* 782 F.2d at 1145. To that end, courts are vested with considerable discretion to determine, on a case-by-case basis, the appropriate method by which the Government must present its case. *Id.* at 1147 ("In the informal evidentiary framework of a detention hearing, the methods used to scrutinize government proffers for reliability must lie within the

discretion of the presiding judicial officer. . . ."); *LaFontaine,* 210 F.3d at 131 (courts have discretion to insist upon the production of the underlying evidence or sources where their accuracy is in question).

Here, the parties do not contest the state of the law as set forth above: all acknowledge that the Government may proceed by proffer and that this Court retains considerable discretion to order the production of underlying evidence if questions of reliability arise. (OA Tr. at 17, 40, 41.) [7] However, Defendants contend that in light of their challenges to portions of the Government's proffer, this Court should direct the Government to produce live witnesses subject to cross-examination, namely FBI Special Agent Edward Needham, who took Defendant Alwan's statement (OA Tr. at 32), and either Agent Gamal Abdel–Hafiz or Agent Rachel F. Pifer, one or both of whom took Defendant Al–Bakri's statement (OA Tr. at 32). Defendants argue that further inquiry into the reliability of these statements is crucial because they comprise the critical pieces of evidence supporting the Government's proffer. (OA Tr. at 28, 30.) By Defendants' account, the absence of the agents' live testimony undermines the sufficiency of the Government's proffer in its totality. (OA Tr. at 31.) This Court disagrees.

The Government proffered a great deal of information during the proceedings before Judge Schroeder. Some of that information was drawn from the statements given by Defendants Alwan and Al–Bakri, while other information was presented by way of direct evidence, *e.g.,* passports, passport stamps, customs reports, airline boarding passes and the fruits of executed search warrants. (Government Exhibit 1.) Further, the Government proffered additional information that was neither derived

**7.** Referring to the December 30, 2002 Oral Argument held before this Court.

from the statements nor from the direct evidence identified above.

To be sure, the statements at issue are salient. Defendants Alwan and Al–Bakri admit that they traveled to Afghanistan and attended the al-Farooq training camp operated by al-Qaeda.[8] (See Government's Exhibit 1; Det. Hr'g. Tr. at 97–98, 313;[9] OA Tr. at 60.) Moreover, they expressly place Defendants Goba, Mosed, Galab and Taher at the al-Farooq camp. (Det. Hr'g. Tr. at 89, 95, 103, 376–77.) Further, Defendant Alwan's statement is proffered to support the Government's assertion that Defendants attended the camp because they wanted to receive the training. (Det. Hr'g. Tr. at 394.)

The Government also proffered evidence of the tactical training offered at al-Farooq, which included training on a variety of firearms, as well as jihad and anti-American indoctrination. This proffer was derived directly from Defendant Alwan's and Defendant Al–Bakri's statements. (Det. Hr'g. Tr. at 73, 74, 89, 102–03, 378.) Notably, information in the statements also indicates that each defendant attended a speech delivered by al-Qaeda leader Usama bin Ladin, wherein bin Ladin espoused anti-American and anti-Israeli sentiments, and addressed the importance of training and fighting for the cause of Islam. (Det. Hr'g. Tr. at 90, 92, 103–04, 201; Government Exhibit 1.)

At this stage, Defendants' stated purpose for seeking to examine Agents Needham, Abdel–Hafiz and Pifer is to test the reliability of Defendant Alwan's and Defendant Al–Bakri's statements. (OA Tr. at 22–23.) However, despite the serious implications that these statements may have for Defendants, this Court finds nothing in the record to suggest that they are unreliable. Indeed, Defendants do not proffer that the statements were made involuntarily or that Agents Needham, Abdel–Hafiz or Pifer exerted undue influence or otherwise acted in violation of Defendant Alwan's or Al–Bakri's rights. Rather, Defendants offer general denials of the substantive information contained in the statements, which this Court finds go to the ultimate weight afforded the statements, not to their reliability at the proffer stage. In this Court's view, Defendants articulate no serious challenge to the reliability of Defendant Alwan's and Defendant Al–Bakri's statements. Thus, this Court finds that Defendants' assertions of unreliability, standing alone, are insufficient to require the Government to produce live testimony from the agents in the absence of any other obligation to do so.

Moreover, the Government here proceeded by more than simple proffer; the record contains direct evidence, presented by the Government, corroborating points of information contained in the statements of Defendants Alwan and Al–Bakri, most notably the timing and method of travel abroad. (See Government Exhibit 1.) In that sense, this Court finds that these circumstances are not unlike those reviewed by the Second Circuit in United States v. LaFontaine, where the Government proceeded largely by proffer in bail revocation proceedings, but corroborated portions of its proffer by extrinsic evidence. See LaFontaine, 210 F.3d at 128–29, 131–32 (finding that the district court did not abuse its discretion by permitting the Government to proceed by way of proffer with evidence).

---

**8.** In his statement, Defendant Alwan refers to the al-Farooq training camp by a different name: the Taseesy camp. (Government's Exhibit 1). By all accounts, the two names refer to the same camp. (Det. Hr'g. Tr. at 63, 91, 430).

**9.** Referring to the detention hearing conducted before Judge Schroeder.

While Defendants' desire to gather additional information concerning the content and context of Defendant Alwan's and Defendant Al–Bakri's statements is understandable, a detention proceeding is not the proper forum for conducting discovery. *Cf. United States v. Contreras*, 776 F.2d 51, 55 (2d Cir.1985) (noting that preliminary criminal hearings are not intended to be discovery tools for the defendant); *cf. Martir*, 782 F.2d at 1145 (the Government's proffer need not expose the sources or proof it will rely upon at trial).

Accordingly, at this stage, this Court finds no cause for further inquiry into the reliability of the Government's proffer. The proceedings before Judge Schroeder comported with the Bail Reform Act's hearing requirements and the governing precedent in this Circuit. This Court therefore declines to exercise its discretion to require the Government to present live testimony from the agents involved in taking Defendant Alwan's and Defendant Al–Bakri's statements.

**2. Entry Point: Crime of Violence**

Turning now to the statutory framework, pretrial detention under § 3142(e) must be predicated on one of the six entry points enumerated in § 3142(f). The Government urges detention on two entry points: (1) crime of violence under § 3142(f)(1)(A), and (2) serious risk of flight under § 3142(f)(2)(A).[10]

█ In this Circuit, a categorical analysis is employed to determine whether an offense constitutes a "crime of violence." *See, e.g., Dalton v. Ashcroft*, 257 F.3d 200, 204 (2d Cir.2001) (employing categorical analysis in examining "crime of violence" under 18 U.S.C. § 16); *Dillard*, 214 F.3d at 92 (agreeing that in analyzing "crime of violence" under 18 U.S.C. § 3156(a)(4)(B) "the risk of force must result from the characteristics of the offense, rather than from the defendant's manner of carrying it out"); *United States v. Campbell*, 28 F.Supp.2d 805, 807 (W.D.N.Y.1998) (employing categorical analysis in examining "crime of violence" under 18 U.S.C. § 3156(a)(4)); *United States v. Carter*, 996 F.Supp. 260, 261–63 (W.D.N.Y.1998) (rejecting "fact specific" approach in favor of "categorical approach" in examining "crime of violence" under 18 U.S.C. § 3156(a)(4)). The categorical analysis "focuse[s] on the intrinsic nature of the offense, rather than on the factual circumstances surrounding any particular violation." *Dalton*, 257 F.3d at 203. This Court finds the categorical analysis applicable here.

█ The immediate issue is whether 18 U.S.C. § 2339B constitutes a "crime of violence" under 18 U.S.C. § 3156(a)(4)(B), which defines "crime of violence" as an offense "that is a felony and that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense."[11] This Court need not linger on this issue because it finds itself in agreement with the analysis employed by the Honorable T.S. Ellis, III, United States District Judge for the Eastern District of Virginia, who thoroughly addressed this point in *United States v.*

---

**10.** The parties agree that the provisions of § 3142(f)(2)(B), pertaining to a serious risk of obstruction of justice or intimidation of prospective witnesses and jurors, do not apply in this case. (OA Tr. at 115–16.)

**11.** At oral argument on December 30, 2002, the parties agreed that this Court's inquiry is properly limited to the definition of "crime of violence" contained in § 3156(a)(4)(B). (OA Tr. at 98, 100.) Thus, this Court will not consider whether § 2339B qualifies as a "crime of violence" under the remaining definitions contained at §§ 3156(a)(4)(A) and (C).

*Lindh,* 212 F.Supp.2d 541, 580 (E.D.Va. 2002).

In *Lindh,* Judge Ellis faced the issue of whether the substantive and conspiracy offenses of knowingly providing material resources and support to al-Qaeda in violation of § 2339B were "crimes of violence" within the meaning of 18 U.S.C. § 924(c)(3)(B).[12] *Id.* at 579. The Fourth Circuit, like the Second Circuit, requires use of the categorical analysis to make "crime of violence" determinations. *See United States v. Aragon,* 983 F.2d 1306, 1313 (4th Cir.1993).

Judge Ellis's application of the categorical analysis led him to conclude that both the conspiracy and substantive offenses of violating § 2339B are "crimes of violence." *Lindh,* 212 F.Supp.2d at 579–80 ("Both of these crimes are, by their nature, crimes of violence.") This Court agrees. As Judge Ellis noted: "[W]hen one provides material support or resources to a terrorist organization, there is a substantial risk that physical force against the person or property of another may be used in the course of committing the offense." *Id.* at 579 (quotations and emphasis omitted).

Defendants argue that the "in the course of" language of § 3156(a)(4)(B) limits this Court's inquiry to the offense conduct at hand.[13] (OA Tr. at 105.) Under Defendants' interpretation, this Court should ignore the inherent risks that stem from Defendants' alleged offense conduct, and focus solely on whether there existed a substantial risk of physical force against another or another's property during "the course of" the commission of the alleged offense itself. This Court rejects such a constrained inquiry.

The phrase 'in the course of committing the offense' does not mean ... that courts must be blind to the natural consequences—the natural risks—attendant to the aiding and abetting of terrorism proscribed by Section 2339B. Rather, the statute requires assessment of the risks that may result from providing material support or resources to terrorists in a manner that Section 2339B forbids. It takes little imagination to conclude that providing material support and resources to a terrorist organization creates a substantial risk that the violent aims of the terrorists will be realized.

*Id.* at 579–80 (footnote and citation omitted).

This Court also concurs in Judge Ellis's conclusion that providing support or resources to a terrorist organization in violation of § 2339B is akin to a conspiracy to commit a crime of violence. *Lindh,* 212 F.Supp.2d at 580. The Second Circuit has consistently found that conspiracies to commit crimes of violence are, themselves,

---

**12.** Eighteen U.S.C. § 924(c)(3)(B) defines "crime of violence" as "a felony ... that *by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.*" (Emphasis added.) As is obvious, it is essentially the same definition Congress utilized at § 3156(a)(4)(B), which defines "crime of violence" as "any other offense that is a felony and that, *by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.*" (Emphasis added.) This Court therefore finds Judge Ellis's analysis instructive,

despite it not concerning § 3156(a)(4)(B) directly.

**13.** At oral argument on December 30, 2002, Defendants also asserted, for the first time, that § 2339A, rather than § 2339B, contains the offenses Congress intended to be "crimes of violence." (OA Tr. at 106–110.) This Court has considered this argument to the extent it has been developed, and finds it to be without merit. Even assuming arguendo that § 2339A is a "crime of violence" (*see* OA Tr. at 111), this Court is aware of no authority supporting the proposition that a violation of § 2339B cannot also constitute a "crime of violence."

crimes of violence. *See, e.g., United States v. Elder,* 88 F.3d 127, 129 (2d Cir.1996)(noting that conspiracy to commit Hobbs Act robberies itself is crime of violence); *United States v. Chimurenga,* 760 F.2d 400, 403–04 (2d Cir.1985)(conspiracy to commit armed robbery is a crime of violence under the Bail Reform Act).

As the Second Circuit stated in *Chimurenga:*

> The existence of a criminal grouping increases the chances that the planned crime will be committed beyond that of a mere possibility. Because the conspiracy itself provides a focal point for collective criminal action, attainment of the conspirators' objectives becomes instead a significant probability.

*Chimurenga,* 760 F.2d at 404 (citing *United States v. Greer,* 467 F.2d 1064, 1071 (7th Cir.1972)).

Accordingly, this Court finds that providing material support or resources to a foreign terrorist organization involves a substantial risk that physical force against the person or property of another may occur. Eighteen U.S.C. § 2339B is therefore a "crime of violence" as that phrase is defined in 18 U.S.C. § 3156(a)(4)(B).[14]

With the entry point requirement satisfied, this Court must now determine whether Defendants pose a risk of flight or danger to the community.

### 3. Risk of Flight

■ This Court finds, after considering the submitted evidence and thoroughly reviewing the 622–page transcript of the proceedings before Judge Schroeder, that each defendant poses a risk of flight if released. Specifically, this Court finds that each defendant has demonstrated the ability to sustain himself abroad for an extended period of time through his own or others' means. In support of this conclusion, this Court credits the following evidence relating to Defendants' manner of travel as proffered before Judge Schroeder.

Defendants traveled abroad in two groups: one consisting of Defendants Taher, Mosed and Galab, and another consisting of Defendants Goba, Al–Bakri, Alwan and an unidentified co-conspirator, "B." (Det. Hr'g. Tr. at 62, 63, 94, 107–08.) Defendants Taher, Mosed and Galab departed from New York on April 28, 2001, and flew directly to Lahore, Pakistan, arriving on April 29, 2001. (Det. Hr'g. Tr. at 63, 107–08, 230.) Each paid $1,309.20 in cash for his airline ticket. (Det. Hr'g. Tr. at 64.)

While Defendants Taher, Mosed and Galab's itinerary in Pakistan is unclear, it is apparent from the statements of Defendants Alwan and Al–Bakri[15] that they eventually made their way to Afghanistan to attend the al-Farooq training camp. (Det. Hr'g. Tr. at 89, 95, 103, 376–77.) The evidence establishes that Defendants Taher, Mosed and Galab departed Lahore, Pakistan on June 27, 2001, and arrived at JFK Airport in New York that same day. (Det. Hr'g. Tr. at 108.)

**14.** This Court's finding that 18 U.S.C. § 2339B is a crime of violence is sound, making a discussion of whether Defendants are also serious risks of flight under 18 U.S.C. § 3142(f)(2)(A) superfluous. *Cf.* 18 U.S.C. § 3142(f) (requiring that only one of the six entry points be satisfied for purposes of detention). However, this Court notes that were it to reach the issue, it would find, for the reasons outlined in the following discussion of flight, that Defendants also pose a serious risk of flight under 18 U.S.C. § 3142(f)(2)(A).

**15.** At this preliminary stage, this Court finds Defendant Alwan's and Defendant Al–Bakri's statements credible, especially in light of the fact that despite being thousands of miles apart and giving statements to separate FBI agents, they largely corroborate one another. (*See* Det. Hr'g. Tr. 372.)

The second group took a more circuitous route to al-Farooq. Defendants Goba, Al–Bakri and Alwan departed the United States during the second week of May 2001. (Det. Hr'g. Tr. at 62, 63, 94, 97.) They traveled to Canada and from there flew to London, England, and then on to the United Arab Emirates. (Det. Hr'g. Tr. at 62, 63, 94, 97.) From the United Arab Emirates, Defendants Goba, Al–Bakri and Alwan flew to Karachi, Pakistan. (Det. Hr'g. Tr. at 62, 63, 94, 97.)

The second group remained in Karachi for approximately one week. (Det. Hr'g. Tr. at 67.) At that time they met another unidentified co-conspirator, "A," who informed them that they were going to meet "The Most Wanted," which, the Government proffered, was a reference to Usama bin Ladin. (Det. Hr'g. Tr. at 67–68, 97, 398, 415.) Defendants Goba, Al–Bakri and Alwan then flew to Quetta, Pakistan, and from there traveled by automobile to Kandahar, Afghanistan. (Det. Hr'g. Tr. at 68, 98.) In Kandahar, Defendants Goba, Al–Bakri and Alwan stayed at a "guest house" maintained by members of the al-Qaeda terrorist organization. (Det. Hr'g. Tr. at 68, 63, 94, 97.) Defendant Al–Bakri stated that the members of the al-Qaeda "guest house" paid for his airfare from Karachi to Quetta. (Det. Hr'g. Tr. at 98.) Defendants Goba, Al–Bakri and Alwan remained at this "guest house" for approximately one week. (Det. Hr'g. Tr. at 69.)

Once twenty or so individuals had arrived at the "guest house," the group, including Defendants Goba, Al–Bakri and Alwan, traveled by automobile to the al-Farooq training camp, which was one to three hours away. (Det. Hr'g. Tr. at 69–70, 95.) After spending a period of time at al-Farooq, Defendant Alwan left Pakistan on June 27, 2001; Defendant Goba left Pakistan on August 2, 2001; Defendant Al–Bakri left Pakistan in August 2001. (Det. Hr'g. Tr. at 104, 106–07.)

Based on the above recitation and the underlying record, this Court finds that each defendant has the ability to sustain himself abroad, with either his own undisclosed resources or by utilization of an international support network. As outlined above, Defendants Taher and Mosed paid $1309.20 in cash for their airline tickets, despite working in low-wage jobs. While that, in and of itself, is not determinative, this Court also notes that Defendants Taher and Mosed remained abroad for approximately two months. While it is unclear exactly how they supported themselves for the entire time they were outside of the United States, it is reasonable to conclude that they either had their own cash-on-hand or were supported by others in Pakistan and Afghanistan. In either case, whether Defendants Taher and Mosed have their own undisclosed financial resources or whether they may be the beneficiaries of others' support, the fact remains that they have demonstrated an ability to maintain themselves abroad for a considerable period of time.

The case is equally clear for Defendants Goba and Al–Bakri, whose pattern of travel more definitively indicates the existence of a support network. They traveled through six countries, sometimes by air, sometimes by ground. They had contact with unidentified co-conspirator "A," who coordinated their stay at the "guest house" in Quetta and their travel to al-Farooq. Moreover, Defendant Al–Bakri specifically told the FBI that the al-Qaeda members running the "guest house" financed his flight from Karachi to Quetta. (Det.Hr'g. Tr. 98.) Nothing in the record suggests that this type of assistance is no longer available.

Further, as for Defendants Goba and Al–Bakri, the proffered evidence demonstrates that they have the ability to travel internationally and cross borders without

detection. Defendant Goba, for example, obtained Pakistani visas for himself, as well as for Defendants Al–Bakri and Alwan. (Det. Hr'g. Tr. at 394.) Moreover, the passports seized from Defendants Goba, Al–Bakri and Alwan do not contain entrance or exit stamps from Afghanistan, indicating each defendant's ability to travel, at least to and from Afghanistan, undetected. (OA Tr. at 122.)

In each defendant's case, this Court finds that the evidence discussed above, as well as Western New York's proximity to the Canadian border and the potential period of incarceration that each defendant faces under the statute, provide evidence sufficient to conclude, by a preponderance of the evidence, that each Defendant presents a risk of flight if released pretrial.

### 4. Dangerousness to the Community

■ Again, having thoroughly reviewed the record in this case, this Court finds, by clear and convincing evidence, that each defendant attended and was trained at the al-Farooq training camp. More specifically, this Court finds that each defendant's attendance and training at the al-Farooq camp, as described in the Government's proffer, in and of itself, renders each defendant a danger to the community. The following recitation, mined from the proffers and direct evidence submitted, constitutes this Court's factual findings on the element of dangerousness.

Within a few days of arriving in Karachi, Pakistan, Defendants Goba, Al–Bakri and Alwan met unidentified co-conspirator "A." (Det. Hr'g. Tr. at 67.) Unidentified co-conspirator "A" informed the group that they were going to meet "The Most Wanted," who they understood to be Usama bin Ladin. (Det. Hr'g. Tr. at 67–68, 97, 398, 415.) In his statement to the FBI, Defendant Al–Bakri declared that he knew mak-

ing the trip was wrong. (Det. Hr'g. Tr. at 68, 97.) However, he and Defendants Goba and Alwan ultimately traveled to al-Farooq.

Prior to attending the camp, however, Defendants Goba, Al–Bakri and Alwan spent approximately one week at an al-Qaeda operated "guest house" in Quetta, Pakistan. (Det. Hr'g. Tr. at 68, 69.) Trainers at the "guest house" espoused anti-American and anti-Israeli sentiments and lectured on the justification for using suicide as a weapon. (Det. Hr'g. Tr. at 69, 88, 98.) The trainers also showed videos about the terrorist attack on the USS Cole that detailed the method by which al-Qaeda carried out the attack.[16] (Det. Hr'g. Tr. at 69, 98.) Attendees were also issued uniforms to be worn at the al-Farooq training camp. (Det. Hr'g. Tr. at 98.) Defendants Goba, Al–Bakri and Alwan all went through this indoctrination. (Det. Hr'g. Tr. at 69, 95.)

After approximately twenty individuals had arrived at the "guest house," the group, including Defendants Goba, Al–Bakri and Alwan, traveled by automobile to the al-Farooq training camp, a camp maintained and financed by the al-Qaeda terrorist organization for the purpose of training and producing fighters for its cause. (Det. Hr'g. Tr. at 69, 72–73 381.)

While the record is not a model of clarity as it pertains to the exact dates that each defendant was at al-Farooq, the Government proffers that Defendant Alwan remained for ten days (Det. Hr'g. Tr. at 74) and that the rest of the Defendants— Goba, Mosed, Taher, Al–Bakri and Galab—remained for a total of five or six weeks of training, although not all of these Defendants were trained together. (Det. Hr'g. Tr. at 90.) For example, when De-

---

**16.** On October 12, 2000, the USS Cole was attacked while refueling in the port of Aden, Yemen. Seventeen United States Servicepeople were killed in the attack.

fendants Goba, Al–Bakri and Alwan arrived at al-Farooq, Defendants Mosed, Taher and Galab had already been there for approximately three or four weeks. (Det. Hr'g. Tr. at 89, 95, 103, 376–77.)

In their statements to the FBI, Defendants Alwan and Al–Bakri described the workings of the al-Farooq camp. Upon arrival at the camp or at the "guest house," each individual began using code names. (Det.Hr'g. Tr. 73, 95–97.) Green uniforms were worn everyday except Friday, when civilian clothes were worn so that the uniforms could be washed. (Det. Hr'g. Tr. at 98, 416.) Defendant Al–Bakri, in his statement to the FBI, described the daily regimen at al-Farooq, which the Government described by way of proffer as follows:

Three o'clock, wake up. Four o'clock, prayer time. Five o'clock, an hour of physical fitness where they run and do push-ups. Six-thirty, breakfast. Allowed to take a nap. Eight-thirty to eleven-thirty, military lecture, where you would learn about things like weapons. Thirteen hundred hours, lunch, followed by prayer. Clean up the camp. More military lecture about one hour. Then they were free to sunset, dinner, prayer.

(Det. Hr'g. Tr. at 416, L. 10–18.)

Defendants Alwan and Al–Bakri also described the military training provided at al-Farooq, and stated that each of them, as well as Defendants Goba, Mosed, Taher, and Galab received the same military and tactical training. (Det. Hr'g. Tr. at 72–74, 89, 129, 378.) Defendants received firearms training on a variety of weapons, including the Kalishnokov automatic weapon, handguns, and long-range rifles. (Det. Hr'g. Tr. at 72–73, 89, 102, 378.) In addition, Defendants Goba, Al–Bakri and Alwan received training or attended demonstrations in the use of C–4, TNT and other explosives (Det. Hr'g. Tr. at 74, 129), while Defendants Taher, Mosed and Galab received mountain climbing training. (Det. Hr'g. Tr. at 89, 378.)

Also while at al-Farooq, each defendant attended a speech delivered by Usama bin Ladin, who appeared in person under heavy guard. (Det. Hr'g. Tr. at 90–92, 103–04, 201.) Bin Ladin spoke of the need to prepare and train for the upcoming fight against Americans, and spoke of the importance of fighting for the cause of Islam. (Det. Hr'g. Tr. at 90–92, 103–04, 201.) Bin Ladin also espoused general anti-American and anti-Israeli sentiments. (Det. Hr'g. Tr. at 90–92, 103–04, 201.) Moreover, trainers at al-Farooq supplemented bin Laden's remarks by speaking about jihad, the justification for using suicide, and how people who commit suicide attacks are martyrs. (Det. Hr'g. Tr. at 103.)

Based on this proffered evidence, the Government urges this Court to recognize a *per se* rule linking attendance and training at a terrorist camp with dangerousness. (OA Tr. at 44–47.) However, outside the confines of this case, this Court is reluctant to adopt the Government's *per se* rule. Other cases may present factual circumstances that would not fit the Government's rule. In addition, the adoption of a *per se* rule, at least facially, connotes an evisceration of the individual consideration that each defendant is entitled to under the Bail Reform Act.

That said, this Court has little difficulty finding that in this case, each individual defendant's attendance and training at the al-Farooq camp makes him a danger to the community. The extent of the weapons and explosives training, as well as the indoctrination that each Defendant underwent, combined with this Court's recognition of the well known fact that terrorist organizations have a modus operandi of training unassuming individuals and then

activating them at a later date, cause this Court to conclude that Defendants' attendance and training at the al-Farooq camp, in and of itself, is more than sufficient to establish by clear and convincing evidence that each defendant poses a danger to the community. After all, the express purpose of attending a terrorist training camp is to increase one's dangerousness. That is, al-Qaeda's goal in running the camp is to make individuals more dangerous coming out than they were going in. Otherwise, there is simply no reason to attend or run a terrorist training camp.

Moreover, this Court finds the fact that each of these defendants was able to personally attend a speech by Usama bin Ladin, a man who is wanted worldwide, to be indicative of their significant connection to the al-Qaeda organization. Usama bin Ladin has an infamous history with the United States. In 1996 he issued a fatwa,[17] calling for holy war against United States forces. (Det. Hr'g. Tr. at 49, 56, 134, 381.) In 1998, bin Ladin publicly declared that Muslims should kill all Americans, civilians and military, wherever found. (Det. Hr'g. Tr. at 49, 56, 134, 381.) Bin Ladin is also suspected of orchestrating numerous attacks on American interests, including the attacks on the USS Cole, the bombing of American embassies abroad, and the attacks of September 11, 2001. (Det. Hr'g. Tr. at 50–51, 57, 94, 387.)

Indeed, Usama bin Ladin and al-Qaeda have not escaped the federal government's attention. By Executive Order 13099 of August 20, 1998, President Clinton added Usama bin Ladin and the al-Qaeda terrorist organization to the list of terrorists with whom transactions are prohibited. *See* 63 FED. REG. 45167 (1998). In October of 1999 and 2001, the Secretary of State designated al-Qaeda as a foreign terrorist organization pursuant to § 219 of the Immigration and Nationality Act. *See* 64 FED. REG. 55112 (1999); 66 FED. REG. 51088 (2001). Al-Qaeda is also a "specially designated terrorist" pursuant to the International Emergency Economic Powers Act. *See* 66 FED. REG. 54404 (2001). Finally, the FBI added bin Ladin to its Ten Most Wanted List in June 1999. (Det. Hr'g. Tr. at 49, 385.)

This Court finds that the available evidence to date regarding Defendants' connection to al-Qaeda leads to the conclusion that each defendant, at least at the time of the alleged offense conduct, supported the terrorist organization.[18] (Det. Hr'g. Tr. at 127.) This finding is buttressed by Defendant Alwan, who the Government proffers informed the FBI that the purpose of each defendants' attendance at the al-Farooq camp was to receive the offered terrorist training. (Det. Hr'g. Tr. at 394.) Moreover, the Government proffered that al-Qaeda and bin Ladin's directives impose a continuing obligation on their followers to perpetrate violence against Americans in the furtherance of al-Qaeda's cause. (OA Tr. at 135.) While this Court recognizes that each Defendant currently disavows allegiance to al-Qaeda, it nonetheless finds that, at this stage, the Government has established, by clear and convincing evidence, that each individual defendant poses a danger to the community.

Further, if each defendant's attendance and training at the al-Farooq camp and connection to al-Qaeda were not enough,

17. A fatwa is a ruling issued by an Islamic scholar. THE AMERICAN HERITAGE DICTIONARY 311 (4th ed.2001).

18. This Court notes that at least one defendant, Defendant Al–Bakri, admitted to the FBI that he considered himself a member of al-Qaeda while at al-Farooq, but after leaving the camp, no longer considered himself a member. (Det. Hr'g. Tr. at 103.)

each defendant also possesses individual characteristics that, taken in combination with his attendance and training at al-Farooq, leave no doubt that he poses a danger to the community.

For example, upon a search of Defendant Al–Bakri's last known residence, the Government discovered an illegal .22 caliber, single shot Derringer with a spent shell casing in the chamber (Det. Hr'g. Tr. at 109, 597) and a single bullet bolt-action rifle with a telescopic sight (Det. Hr'g. Tr. at 110). In addition, the Government found a cassette tape entitled "Call to Jihad" or "Invitation to Jihad." (Det. Hr'g. Tr. at 110.) Still further, Defendant Al–Bakri admitted to sending an e-mail regarding a planned attack by al-Qaeda on Americans. (Det. Hr'g. Tr. at 111, 113.) That e-mail message, which has commonly been referred to in these proceedings as the "Big Meal" e-mail, has been translated as follows:

> "How are you my beloved, God willing you are fine. I would like to remind you of obeying God and keeping him in your heart because the next meal will be very huge. No one will be able to withstand it except those with faith. There are people here who had visions and their visions were explained that this thing will be very strong. No one will be able to bare [sic] it."

(Government's Exhibit 1.)

While a search of Defendant Goba's residence did not reveal any weapons, it did reveal three Arabic audiotapes. However, this Court is not convinced that these tapes are anything but wholly innocuous musical recordings and recitations of the Koran. (Det. Hr'g. Tr. at 174–75, 488–495.) This Court notes, however, that Defendant Al–Bakri described Defendant Goba as the "emir" and leader of the group, who collected money for the trip and secured visas to Pakistan for himself

and Defendants Alwan and Al–Bakri. (Det. Hr'g. Tr. at 104, 394–95.)

The search of Defendant Mosed's last known residence revealed an illegal Panther stun gun, still in its original package. (Det. Hr'g. Tr. at 517; OA Tr. at 64.) In a search of Defendant Taher's wife's apartment, the Government discovered a nine-page document, which included a discussion of the justification of suicide as a form of martyrdom under Islam. (Det. Hr'g. Tr. at 517–532; Taher Exhibit 4.)

In fairness, this Court notes that each Defendant offers innocuous explanations and excuses for his possession of weapons or indoctrination material. If it were simply the possession of these items, this Court might be persuaded to delve deeper into an examination of the nature of the weapons and materials. Certainly, possession of the written materials seized from Defendants alone cannot be held against them, and in fact, each defendant has an affirmative right under the First Amendment to possess such materials. Innocuous explanations or not, taken in the context of each defendant's travel abroad for the purposes of undergoing terrorist training at an al-Qaeda camp where Usama bin Ladin personally appeared, this Court need not be blind to the implications that Defendants' possession of these materials suggests.

Accordingly, for the reasons discussed above, this Court first finds, by clear and convincing evidence, that each defendant attended and was trained at the al-Farooq training camp as described in the Government's proffer. In addition, this Court finds that each defendant's attendance and training at the al-Farooq camp described in the Government's proffer, in and of itself, renders each defendant a danger to the community. Moreover, the fact that each defendant attended an al-Qaeda training camp and was able to sit as an audi-

ence for Usama bin Laden supports a finding of dangerousness as it indicates the existence of a significant connection to the al-Qaeda terrorist network. Finally, the discovery of weapons or indoctrination materials, or both, through searches of Defendants' residences, as described above, further supports a finding of dangerousness in this case.

### 5. Release Condition or Combination of Release Conditions

■ Having found that § 2339B is a "crime of violence" and that each defendant is a flight risk and danger to the community, the final stage of analysis under the Bail Reform Act requires resolution of the ultimate statutory issue: whether a release condition or set of release conditions exist that, if imposed, will eliminate these risks. *See* 18 U.S.C. § 3142(e); *see also United States v. Millan*, 4 F.3d 1038, 1048 (2d Cir.1993). This Court concludes that there are not.

In so finding, this Court has considered the factors outlined in § 3142(g) and has afforded them due weight. As this Court's previous discussion foreshadows, it finds that the grave nature and circumstances of the crimes of violence charged in the Indictment, the considerable weight of the Government's proffered evidence against each defendant, and the nature and seriousness of the danger to the community that each defendant poses by virtue of his attendance and training at al-Qaeda's al-Farooq terrorist training camp, lead to the impregnable conclusion that no release condition or combination of release conditions set forth in § 3142(c), or otherwise, could assure Defendants' future appear-

ance or the safety of the community. *Cf.* 18 U.S.C. §§ 3142(g)(1),(2) and (4).

In reaching this conclusion, this Court has considered each individual defendants' personal history and characteristics. *See* 18 U.S.C. § 3142(g)(3). Each defendant shares the common factors of being a United States citizen, having long-standing ties to Lackawanna, NY, having family and friends living in and around Western New York, and having no significant criminal history.[19] Each also possesses individual characteristics that this Court has considered.

This Court has weighed the fact that Defendant Goba is regarded as a leader of the Yemeni community in Lackawanna, NY, and is involved in the daily practice of teaching language and religion to children in his community. (Det. Hr'g. Tr. at 186; OA Tr. at 118.) Defendant Goba is married and his wife is expecting their first child. (OA Tr. at 118.) Moreover, this Court acknowledges that Defendant Goba is in good physical and mental condition and is not a drug or alcohol user. (Det. Hr'g. Tr. at 187, 189; OA Tr. at 125.)

This Court is also cognizant of the fact that Defendant Al–Bakri is married, although his wife currently resides in Bahrain, and that he is only twenty-two years old. (Det. Hr'g. Tr. at 80, 314; OA at 148.) Defendant Al–Bakri has no prior arrests and is not a drug user. (OA Tr. at 148.)

Moreover, this Court has considered that Defendant Taher is twenty-four years old and was fairly steadily employed prior to his arrest. (Det. Hr'g. Tr. at 248–49, 274, 276, 284, 531.) He is married under the Muslim faith to one Nicole Frick, and together, they have a three-year-old son.

---

**19.** This Court notes that the existence of a criminal history or record of violence or dangerousness is not necessary to support pretrial detention. *See LaFontaine*, 210 F.3d at 134; *see also United States v. Rodriguez*, 950

F.2d 85, 89 (2d Cir.1991)(noting that while a prior record of violence eases the government's burden of showing dangerousness, it is not essential).

(Det. Hr'g. Tr. at 275, 532; OA Tr. at 70.) Defendant Taher lives part-time with his mother and part-time with Ms. Frick. (Det. Hr'g. Tr. at 274, 284.) He has been arrested twice, but has no criminal convictions, and he does not use alcohol or drugs. (Det. Hr'g. Tr. at 278.)

Finally, this Court recognizes that Defendant Mosed is twenty-four years old, is married, and lives with his wife and son in an apartment in Lackawanna, N.Y. (Det. Hr'g. Tr. at 218–19; OA Tr. at 66, 136.) He, along with his three brothers and two sisters, helps take care of his mother, who suffers from mental health difficulties. (Det. Hr'g. Tr. at 219.) Defendant Mosed is an avid sports fan and was enrolled at Erie Community College prior to his arrest. (Det. Hr'g. Tr. at 221; OA Tr. at 66.)

Nonetheless, this Court finds that each individual defendant's background is significantly outweighed by the risk of flight and danger to the community that each poses as a result of his demonstrated ability to live abroad for an extended period of time and by his attendance and training at al-Qaeda's al-Farooq terrorist training camp.

In light of these facts, the inescapable conclusion is that no set of release conditions will adequately guard against the inherent risks that each defendant presents. In this Court's view, the electronic surveillance suggested by defense counsel (OA Tr. at 151–52) is simply insufficient. *Cf. United States v. Orena,* 986 F.2d 628, 632–33 (2d Cir.1993). Here, defending

against the danger that each of these four men present would require institution of four replica detention facilities, a measure not required by the caselaw. *See Millan,* 4 F.3d at 1049 ("Home detention and electronic monitoring at best elaborately replicate a detention facility without the confidence of security such a facility instills.") (quoting *United States v. Gotti,* 776 F.Supp. 666, 672 (E.D.N.Y.1991)(internal quotations omitted)). Thus, Defendants' future appearance and the safety of the community can only be reasonably assured by Defendants' continued pretrial detention.

Accordingly, after due consideration of the factors to be considered in § 3142(g) and the release conditions outlined in § 3142(c), this Court finds that Defendants' current pretrial detention shall be maintained.

## IV. CONCLUSION

In conclusion, I find the following: (1) that the Government's presentation by proffer with evidence before Judge Schroeder satisfied the requirements of the Bail Reform Act, (2) that 18 U.S.C. § 2339B is a "crime of violence" as that phrase is defined in 18 U.S.C. § 3156(a)(4)(B), and (3) that no release condition or combination of release conditions could be imposed to eliminate the risk that Defendants may flee the District or the danger that Defendants pose to the community. Accordingly, Defendants' Motions for Revocation of Judge Schroeder's Detention Order are denied.[20]

---

**20.** Defendant Galab pled guilty to a Superceding Information after this Court's present Decision and Order was substantially completed, but prior to its issuance. Thus, this Court did not consider the substantive information revealed in Defendant Galab's plea agreement in relation to the issues presented herein. This Court notes, however, that the following factual basis outlined in the plea agreement

significantly supports this Court's finding that pretrial detention is necessary in this case:
*FACTUAL BASIS*
5. The defendant and the government agree to the following facts, which form the basis for the entry of the plea of guilty for this defendant including relevant conduct:
a.) In approximately early April, 2001, defendant FAYSAL GALAB, along with codefendants YAHYA GOBA, SHAFAL MOSED,

YASEIN TAHER, MUKHTAR AL–BAKRI, SAHIM ALWAN, and others, agreed to attend a military-type training camp located in the country of Afghanistan. The defendant knew, prior to departing the United States, that the planned trip was illegal. On April 28, 2001, defendant GALAB, together with codefendants SHAFAL MOSED and YASEIN TAHER, commenced their trip to the al Farooq terrorist training camp. The defendants traveled from Buffalo, New York to JFK International Airport located on Long Island, New York, and there boarded Pakistan International Airline's Flight Number 712Y bound for Lahore, Pakistan. The defendants arrived in Lahore, Pakistan on or about April 29, 2001. After spending several days in Lahore, defendants GALAB, MOSED and TAHER traveled to Quetta, Pakistan, where they stayed at a guest house believed to be associated with Usama bin Ladin and the al Qaeda terrorist organization. The next day, the defendants traveled to Kandahar, Afghanistan, where they again stayed at a guest house associated with al Qaeda terrorist organization. While at the Kandahar guest house, the defendant viewed a movie or videotape on a number of subjects, including the conflicts in Bosnia and Chechnya. The staff at the Kandahar guest house also sold the defendant the uniform to be worn during his time at the al Farooq training camp.

Approximately four days after their arrival in Kandahar, defendants GALAB, MOSED and TAHER traveled to the al Farooq training camp associated with Usama bin Ladin and the al Qaeda terrorist organization. Over a period of time consisting of the next several weeks, the defendants, while at the al Farooq training camp, worked under the direction and control of members of the al Qaeda organization, and received and took orders from instructors at the camp. Among other things, the defendants received training and instruction in the use of weapons, during which time the defendants were shown how to assemble and fire a number of firearms, including a Kalishnikov, 9mm handgun, rifle, M16 automatic rifle, and a rocket propelled grenade launcher. All persons at the camp, including defendants GALAB, MOSED and TAHER, were also required on a periodic basis to perform guard duty for the camp. The defendant also received instruction and training on the other military-type subjects consisting of explosives, and tactics.

Approximately three weeks after defendants GALAB, MOSED and TAHER arrived at the al Farooq training camp, the head of the al Qaeda terrorist organization, Usama bin Ladin, appeared and spoke to all persons at the camp. By the time of this visit by Usama bin Ladin, defendants GOBA, ALWAN, and AL–BAKRI had also arrived at the al Farooq camp, and were receiving the same weapons training that defendants GALAB, MOSED, and TAHER had received. Among other things, Usama bin Ladin spoke at either this speech or an earlier speech of attacking America, and stated that 50 men were on a mission to attack America. Usama bin Ladin also claimed responsibility for attacking American embassies on the continent of Africa. Defendant GALAB left the al Farooq training camp before completing all of the training that was available. On June 27, 2001, defendants GALAB, MOSED, and TAHER left the country of Pakistan and returned to JFK airport in New York on that same day. Within a few days of GALAB's subsequent return to Buffalo, New York, defendant ALWAN approached GALAB and informed GALAB that he (ALWAN) had been contacted by a member of the FBI regarding his trip overseas. ALWAN stated to GALAB that he (ALWAN) had falsely told the FBI that he did not travel to Afghanistan, and further told GALAB that, if approached by the FBI, he should lie to the FBI regarding his travel overseas. Defendant ALWAN repeated this statement to GALAB two more times in the months following this initial instruction.

Defendant ALWAN further told defendant GALAB that on one occasion, ALWAN personally met with Usama bin Ladin while ALWAN was in Kandahar. ALWAN told GALAB that bin Ladin asked ALWAN whether anyone in America is willing to die for the cause.

The parties agree that on August 20, 1998, President William Clinton issued Executive Order 13099, which amended the Annex to Executive Order 12947 by adding Usama bin Ladin and al Qaeda to the list of specially designated terrorists. The parties further agree that Executive Order 13099 prohibited transactions by United States persons with Usama bin Ladin and al Qaeda, and that at all times relevant to the Superseding Information, defendant GALAB was a United States person.

b.) The above facts are set forth for the limited purpose of complying with Rule

## V. ORDERS

IT HEREBY IS ORDERED, that Defendants' Motions for Revocation of Judge Schroeder's Detention Order (Docket Nos. 39, 57 and 58) are DENIED.

FURTHER, that the pretrial detention of Defendants Yahya Goba, Shafal Mosed, Yasein Taher and Mukhtar Al–Bakri shall be maintained pursuant to 18 U.S.C. § 3142(e).

FURTHER, that the Government's Motion to Supplement Record on Detention Motion (Docket No. 80) is DENIED as moot.[21]

SO ORDERED.

11(f) and are not intended to serve as a complete statement of the defendant's knowledge concerning the conduct of the codefendants.

21. On January 13, 2003, the Government filed a Motion to Supplement Record on Detention Hearing. In light of this Court's present Decision and Order, the Government's motion is moot.