**UNITED STATES of America,**
**Plaintiff,**

v.

**Anthony F. GIORDANO, Defendant.**

**No. 0580061CR.**

United States District Court,
S.D. Florida.

May 11, 2005.

Rolando Garcia, Esq., United States Attorney's Office, PTS Officer, Pretrial Services Office, Probation Officer, United States Probation Office, West Palm Beach, FL, for Plaintiff.

Donald I. Bierman, Bierman Shohat Loewy & Klein, Miami, FL, Bruce Alan Zimet, Fort Lauderdale, FL, Jon A. Sale, Sale & Kuehne Bank of America Tower, Miami, FL, for Defendant.

## ORDER DENYING MOTION FOR PRETRIAL DETENTION

TORRES, United States Magistrate Judge.

This matter is before this Court on the Government's motion to detain defendant Anthony F. Giordano ("defendant" or "Giordano") without bond pending his trial, in accordance with the Bail Reform Act, 18 U.S.C. § 3142. The defendant was arrested pursuant to the Grand Jury's Indictment that charged him with thirty-five (35) counts of conspiracy, mail fraud, wire fraud, and money laundering in violation of 18 U.S.C. §§ 2, 371, 1341, 1343, 1956 and

1957. The defendant is not charged with a crime of violence or a narcotic crime, nor does he have any past criminal history, which are predicates for a presumption of detention and necessary for the Government to seek to detention of this defendant as a danger to the community under 18 U.S.C. § 3142(f)(1). The Government is thus entitled to move for detention only on the argument that the defendant poses a serious risk of flight under 18 U.S.C. § 3142(f)(2)(A).

A detention hearing, pursuant to section 3142(f)(2)(A), was held on April 27, 2005, during which the Court considered the Government's proffer and evidence, evidence offered by the defendant that he did not pose a risk of flight, and the Pretrial Services Report that recommended no pretrial detention. Although the Government presented a good faith argument for detention based upon risk of flight, the Court concluded that the Government had not presented sufficient evidence under a preponderance of evidence standard to prove that this risk was serious enough to require detention. The Court found that there were bond conditions that could be imposed in this case that would reasonably assure the Court that Giordano will appear at trial.

The crux of the issue in this case is whether a U.S. citizen who has no prior criminal history, who has substantial family ties in the United States, who has no history of flight or known intentions to flee, who is only 29 years old and likely facing only about 8 to 10 years in prison if convicted on all counts, but who is charged with a long-running fraud that allegedly produced significant sums to finance flight, must be detained before trial. Like other Judges in this District faced with similar cases, this Court is not convinced that this defendant will flee from this indictment if released on a substantial monetary bond that would also be accompanied by strict conditions including home detention and electronic monitoring. The Government's contrary position seems to assume that there is a presumption of detention in any significant economic fraud case where the Government alleges that monies are available to finance flight. Yet, absent Congressional action to amend the statute, section 3142 now presumes that this defendant is eligible for a bond, even in a case involving serious economic crimes that may have been financially lucrative, where no compelling evidence exists that tips the balance against that presumption.

Furthermore, notwithstanding the Government's stated concession during the hearing that it understood it could not seek to detain the defendant strictly based upon danger to the community, it appears that the thrust of the Government's case was still based upon that perceived danger rather than a real serious risk of flight. The evidence of risk of flight was sparse and conclusory, while the evidence submitted showing the alleged pattern of fraudulent conduct on the part of this defendant was more identifiable. The statutory scheme as currently constructed, however, does not support the stronger part of the Government's case that the threat of continuing economic fraud triggers a right to detention. The Court, therefore, finds that there are conditions or combinations of conditions that will reasonably assure the appearance of Giordano at trial. Nevertheless, based upon the Government's intention to appeal this finding, the Court will stay this matter and order the defendant detained pending the District Judge's *de novo* determination of the Government's appeal pursuant to 18 U.S.C. § 3145(a)(1).

## I. *APPLICABLE PRINCIPLES OF LAW*

### A. *The Bail Reform Act*

The Bail Reform Act of 1984, 18 U.S.C. § 3141, *et seq.*, sets forth the applicable

principles of law this Court must follow in order to release or detain Giordano prior to trial. This statute was enacted in response to what Congress perceived to be a crisis in the area of federal bail determinations. Before 1984, the concept of future dangerousness of a criminal defendant that would be posed if the defendant was released on bail was not considered except in capital cases. *See* Bail Reform Act of 1966, 18 U.S.C. § 3148 (1982), *repealed by* Bail Reform Act of 1984, Pub.L. No. 98–473, 98 Stat.1976 (1984). In all other cases, bail and other conditions of release were imposed solely to assure the appearance of a defendant at trial. *E.g., United States v. Himler,* 797 F.2d 156, 159 (3d Cir.1986). Congress intended to expand the number of cases where defendants could be detained before trial based upon dangerousness, beyond just capital cases. "Congress hoped to give the courts adequate authority to make release decisions that give appropriate recognition to the danger a person may pose to others if released." *United States v. Salerno,* 481 U.S. 739 744, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987) (quoting S.Rep. No. 98–225, at 3).

Under this new expanded statute, a court is required to order pretrial release on personal recognizance or upon the execution of an unsecured appearance bond "unless the judicial officer determines that such release will not reasonably assure the appearance of the person as required or will endanger the safety of any other person or the community." 18 U.S.C. § 3142(b). In that case, the judicial officer must consider a number of conditions that will accompany the release order to satisfy itself that those predominant statutory goals are met. 18 U.S.C. § 3142(c). "If, after a hearing pursuant to [section 1342(f)], the judicial officer finds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community, he shall order the detention of the person prior to trial." 18 U.S.C. § 3142(e).

After the passage of the amended and broader statute, several constitutional challenges were raised to the expanded dangerousness determination, based upon the argument that it was unconstitutional to detain someone for an extended period without a trial. Eventually, these challenges reached the Supreme Court for its consideration in *United States v. Salerno.* Chief Justice Rehnquist's opinion rejected those constitutional challenges based upon the compelling regulatory interest that the Government has in reasonably safeguarding the community from further criminal acts. 480 U.S. at 749–51, 107 S.Ct. 1492. The Court's opinion expressly relied upon the procedural protections found in section 3142(f) to guard against unwarranted or unjustified intrusion into personal liberty. *Id.* at 742, 747–52, 107 S.Ct. 1492. As the Chief Justice explained:

> The Bail Reform Act carefully limits the circumstances under which detention may be sought *to the most serious of crimes.* See 18 U.S.C. § 3142(f) (*detention hearings available if case involves crimes of violence, offenses for which the sentence is life imprisonment or death, serious drug offenses, or certain repeat offenders*).

*Id.* at 747, 107 S.Ct. 1492 (emphasis added). Moreover, the individual's liberty interests will be constitutionally protected based upon "Congress' careful delineation of the circumstances under which detention will be permitted . . . ." *Id.* at 751, 107 S.Ct. 1492.

Accordingly, section 3142(f) is central to the detention determination because it sets forth the statutory mechanism that insulates this statute and this process from constitutional attack. Section 3142(f) provides in material part:

The judicial officer shall hold a hearing to determine whether any condition or combination of conditions set forth in subsection (c) of this section will reasonably assure the appearance of such person as required and the safety of any other person and the community—

(1) upon motion of the attorney for the Government, in a case that involves -

(A) a crime of violence, or an offense listed in section 2332b(g)(5)(B) for which a maximum term of imprisonment of 10 years or more is prescribed;

(B) an offense for which the maximum sentence is life imprisonment or death;

(C) an offense for which a maximum term of imprisonment of ten years or more is prescribed in the Controlled Substances Act (21 U.S.C. 801 et seq.), the Controlled Substances Import and Export Act (21 U.S.C. 951 et seq.), or the Maritime Drug Law Enforcement Act (46 U.S.C.App.1901 et seq.); or

(D) any felony if such person has been convicted of two or more offenses described in subparagraphs (A) through (C) of this paragraph, or two or more State or local offenses that would have been offenses described in subparagraphs (A) through (C) of this paragraph if a circumstance giving rise to Federal jurisdiction had existed, or a combination of such offenses; or

(2) Upon motion of the attorney for the Government or upon the judicial officer's own motion, in a case that involves-

(A) a serious risk that such person will flee; or

(B) a serious risk that such person will obstruct or attempt to obstruct justice, or threaten, injure, or intimidate, or attempt to threaten, injure, or intimidate, a prospective witness or juror.

## B. *The Statutory Basis for Detention*

■ It is uniformly accepted, based upon these provisions of the statute and the relevant legislative history, there are only six instances that permit a court to convene a detention hearing:

1. Cases involving crimes of violence;

2. Cases involving a maximum sentence of life imprisonment or death;

3. Cases involving serious drug offenses (those involving maximum sentences of ten years or more);

4. Cases involving recidivist offenders (those with two or more relevant felonies);

5. Cases involving a serious risk of flight; or

6. Cases involving a serious risk that a defendant will obstruct justice.

*E.g., Salerno,* 481 U.S. at 747, 107 S.Ct. 2095; *Himler,* 797 F.2d at 160; *United States v. Ploof,* 851 F.2d 7, 10 (1st Cir. 1988); *United States v. Friedman,* 837 F.2d 48, 49 (2d Cir.1988); *United States v. Byrd,* 969 F.2d 106, 109 (5th Cir.1992). According to the legislative history to the Act, these discrete predicate categories "in effect serve to limit the types of cases in which detention may be ordered prior to trial." S.Rep. No. 98–225, at 20, *reprinted in* 1984 U.S.Code & Admin. News 3182, 3203. *See also Himler,* 797 F.2d at 160 ("The legislative history of the [Act] makes clear that to minimize the possibility of a constitutional challenge, the drafters aimed toward a narrowly-drafted statute . . . addressed to the danger from 'a small but identifiable group of particularly dangerous defendants.' ") (quoting S.Rep. No. 98–225, at 6–7, 1984 U.S.Code & Admin. News at 3189).

The first four categories of offenses that trigger detention are set forth in section 3142(f)(1). Not only do these four categories of offenses give the Government the right to seek detention, for most of those circumstances there is a rebuttable presumption that no combination or conditions will reasonably assure the defendant's ap-

pearance or the safety of any other person or the community. *See* 18 U.S.C. § 3142(e), (f). The defendant must then produce sufficient evidence to rebut those presumptions, in which case the Government must still bear the burden of persuasion of risk of flight by a preponderance of the evidence, and for danger to the community by clear and convincing evidence. *Id.*

■ There is no dispute that this case does not present any of those four categories of offenses. This case presents no crime of violence, no life term or death sentence, no drug offense, and Giordano has no criminal history. The Government thus concedes that there is no presumption of detention here. Indeed, as stated earlier, there is a statutory presumption that Giordano should be released pending his trial. 18 U.S.C. § 3142(a)-(c); *Salerno*, 481 U.S. at 754–55, 107 S.Ct. 2095 ("when the Government has admitted that its only interest is in preventing flight, bail must be set by a court at a sum designed to ensure that goal, and no more.") (citing *Stack v. Boyle*, 342 U.S. 1, 5, 72 S.Ct. 1, 96 L.Ed. 3 (1951) ("Unless the right to bail before trial is preserved, the presumption of innocence, secured only after centuries of struggle, would lose its meaning.")); *see also United States v. Riccardi*, 2002 WL 1402232, at *1 (D.Kan.2002) ("By its very

language, the Act demonstrates its favorable inclination toward pretrial release of federal criminal defendants."); *United States v. DeBeir*, 16 F.Supp.2d 592, 593 (D.Md.1998) ("The [Act] favors release of defendants awaiting trial.") (citing *Byrd*, 969 F.2d at 109).

The remaining two categories—serious risk of flight or obstruction of justice—are prescribed by section 3142(f)(2). The Government also conceded at the detention hearing that only the serious risk of flight prong of this subsection applied in this case. *See* Trans. of Hearing, Apr. 27, 2005, at 18–19 [D.E. 27] (hereinafter "Trans."). Although the Government initially argued that it was operating under both the "risk of flight and economic danger to the community" prongs of the statute, *id.* at 4, upon further questioning from the Court the Government candidly conceded that its detention motion could only rise or fall under the serious risk of flight provision of subsection (f)(2)(A). *Id.* at 18–19.[1]

■ The Government's concession and clarification were entirely appropriate. Circuit Court opinions considering this issue under section 3142(f) have all ruled that the "dangerousness" prong for pretrial detention under section 3142(e) *only* applies to cases that arise under section 3142(f)(1). *See, e.g., Himler*, 797 F.2d at 160;[2] *Byrd*, 969 F.2d at 109–10.[3] In the

1. The Government did further clarify its position, as quoted here, that the economic danger posed by Giordano if released could still be considered by the Court in applying the factors found in section 3142(g) to the risk of flight analysis. *See* 18 U.S.C. § 3142(g)(4).

 THE COURT: So I take it that the basis of your motion on risk of flight at this point is based I suppose on the cumulative amount of money that he would have to flee. Does that what it boils down to?
 MR. GARCIA: Correct.
 THE COURT: All right.
 MR. GARCIA: And one of the factors that the court considers under that risk of flight are the factors under G and what are those

factors? Economic danger to the community, and it is our position that he possess an economic danger to this day to the community.
 THE COURT: Right.
 MR. GARCIA:. The defendant's criminal record—
 THE COURT: Although you would agree that that wouldn't independently be a basis to detain, right, under the statute?
 MR. GARCIA: Correct. I mean, under F, it is the risk of flight prong.

2. The Third Circuit in *Himler*, in a case involving a prosecution for production of false identification, explained that where only the serious risk of flight category was relevant to

most relevant decision to this case, *Ploof,* 851 F.2d at 11, the First Circuit expressly followed *Himler's* reasoning in an economic crime case involving allegations of conspiracy to make false statements to a banking institution and bank fraud. The district court appeared to have detained the defendant only on dangerousness grounds, even though none of the categories of offenses in section 3142(f)(1) applied. The district court had also not made risk of flight or obstruction of justice findings sufficient to trigger detention under section 3142(f)(2). Thus, the court reversed the detention order:

> In essence, we interpret the statute in the same manner as has the Third Circuit. That is, where detention is based on dangerousness grounds, it can be or-

dered only in cases involving one of the circumstances set forth in § 3142(f)(1).... [P]re-trial detention solely on the ground of dangerousness to another person or to the community is not authorized.

*Id.* at 11–12 (remanding for district court to clarify "whether detention is based, on the one hand, on dangerousness to the community under subsection (f)(1) or, on the other, on witness intimidation or obstruction of justice under subsection (f)(2)(B))." Other circuits have also followed this reasoning.[4]

The Eleventh Circuit has not had occasion to apply or follow these circuits' reasoning as to the dangerousness prong of section 3142(f). There is no indication,

---

that case, "we hold that the statute does not authorize the detention of the defendant based on danger to the community from the likelihood that he will if released commit another offense.... Any danger which he may present to the community may be considered only in setting conditions of release. He may be detained only if the record supports a finding that he presents a serious risk of flight." *Id.*

**3.** The Fifth Circuit in *Byrd* followed the reasoning of the earlier *Himler* decision and held that "detention can be ordered only in certain designated and limited circumstances, irrespective of whether the defendant's release may jeopardize public safety. Nevertheless, we find ourselves in agreement with the First and Third Circuits: a defendant's threat to the safety of other persons or to the community, standing alone, will not justify pre-trial detention." *Id.* It should be noted that this often-cited case, involving a prosecution for distribution and possession of child pornography, probably contributed to the 2003 amendments to the Bail Reform Act through which various crimes involving children, like child pornography cases, were to be categorized as crimes of violence such that the presumption of dangerousness did apply under section 3142(f)(1). That is significant because the Congress clearly understood the state of the law prior to this amendment that limited the

dangerousness prong to section 3142(f)(1) cases, and extended the law only in a limited, specific way. The Congress could have, of course, provided that dangerousness could be extended to a broader array of cases; the fact that it chose not to do so reaffirms the validity of *Byrd's* reasoning. *See Conroy v. Aniskoff,* 507 U.S. 511, 516 & n. 10, 113 S.Ct. 1562, 123 L.Ed.2d 229 (1993) (holding that there is a presumption that Congress is aware of the relevant case law) and *Chisom v. Roemer,* 501 U.S. 380, 396, 111 S.Ct. 2354, 115 L.Ed.2d 348 (1991) (holding that if Congress had an intent to deviate from an established legal rule, "Congress would have made it explicit in the statute"), *cited in Harris v. Garner,* 216 F.3d 970, 997 (11th Cir.2000).

**4.** *E.g., United States v. Carter,* 996 F.Supp. 260, 265–66 (W.D.N.Y.1998) ("In contrast to a motion for detention based on the defendant being charged with a crime of violence, evidence of dangerousness is ordinarily not relevant to a risk of flight detention motion. *United States v. Friedman,* 837 F.2d 48, 49 (2d Cir.1988). *See also* [*Ploof* and *Himler*]."); *United States v. DeBeir,* 16 F.Supp.2d 592, 594–95 (D.Md.1998) ("[The Act] allows dangerousness to justify detention only for those individuals who fall within the carefully delineated categories set forth in § 3142(f)(1), rather than those who pose a risk of flight or risk of obstruction of justice under (f)(2).").

however, that our Circuit would interpret section 3142(f) any differently. The Court has consistently applied the statute narrowly, limited to its express provisions and consistent with the applicable legislative history. *See, e.g., United States v. King,* 849 F.2d 485, 487 (11th Cir.1988) (quoting definition of dangerousness in the Senate Report to the statute, S.Rep. No. 98–225, 1984 U.S.Code Cong. & Admin. News at 3195–96); *United States v. Johnson,* 399 F.3d 1297, 1301–02 (11th Cir.2005) (rejecting Government's expansive definition of crime of violence under the statute and holding that charge of possession of firearm by felon does not constitute crime of violence to require detention under section 3143(a)(2), following majority rule in other circuits).[5]

Therefore, the only relevant issue here is whether the Government has satisfied its burden to show that Giordano is a serious risk of flight under section 3142(f)(2)(A).

## C. The Factors Considered for Serious Risk of Flight

To answer that question, one begins with the statutory factors set forth in section 3142(g): (1) the nature and circumstances of the offense(s), (2) the weight of the evidence, (3) the history and characteristics of the defendant, and (4) the nature and seriousness of the danger posed by the defendant's release. Utilizing these factors, the answer to whether a defendant poses a "serious risk of flight" is derived from a fact-specific examination to determine if there exist conditions or a combination of conditions that would reasonably assure a defendant's appearance at future court proceedings if released. *E.g., Carter,* 996 F.Supp. at 265. In a case such as this, that examination requires a court to take into account whether a defendant has substantial foreign ties, has access to considerable funds to finance flight from the jurisdiction, or has manifested or demonstrated an intent to flee if arrested. *E.g., Quartermaine,* 913 F.2d at 916–17 (defen-

**5.** There is language found in *King* that could in isolation be read to the contrary. In *King,* the Court affirmed the substantive bases for Judge Gonzalez's order of detention of a defendant charged with serious narcotic offenses based upon both risk of flight and dangerousness. On appeal, the court found that the presumption found in section 3142(f)(1) applied, and thus even if the defendant could overcome the presumption of dangerousness, he could have been detained as a risk of flight as well. 849 F.2d at 488. The court followed the reasoning of other circuits that "a finding of either danger to the community *or* risk of flight will be sufficient to detain the defendant pending trial." *Id.* (quoting *United States v. Portes,* 786 F.2d 758, 765 (7th Cir.1985) and emphasis in original). That conclusion certainly follows from 18 U.S.C. § 3142(e) when a case arises under section 3142(f)(1) as in *King,* as well as the cases *King* cited for the proposition that either prong can be found to detain a defendant. *See Portes,* 786 F.2d at 765 (narcotics charge); *United States v. Daniels,* 772 F.2d 382, 383 (7th Cir.1985) (same); *United States*

*v. Rodriguez,* 803 F.2d 1102, 1103 (11th Cir. 1986) (same). *See also United States v. Quartermaine,* 913 F.2d 910, 915 (11th Cir.1990) (reversing order denying detention based on presumption of risk of flight or danger in narcotics case under section 3142(f)(1); "The Act provides a rebuttable presumption of risk of flight *or* danger to the community when a defendant has been indicted for *certain crimes.*") (emphasis added). The Eleventh Circuit has not, however, applied the disjunctive test of risk of flight or dangerousness to a case that arises solely under section 3142(f)(2) or to an economic crime case in particular. There is no basis to conclude that the Court would not agree with all the other circuits that have addressed this specific issue. *See Sokol Bros. Furniture Co. v. Commissioner of Internal Revenue,* 185 F.2d 222, 224 (5th Cir. 1950) (other circuit opinions are not binding but accorded great weight). And, as evidenced by the Government's concession in this case, there is no statutory support for a contrary view that applies dangerousness analysis to a section 3142(f)(2) case, at least without further Congressional action.

dant was a serious flight risk because he had access to considerable funds outside the United States, stated that Honduras was his country, and had business ties to Panama and Colombia).

■ In cases where only a serious risk of flight is at issue under § 3142(f)(2), it is generally accepted that more than evidence of the commission of a serious crime and the fact of a potentially long sentence is required to support a finding of serious risk of flight. *Friedman,* 837 F.2d at 49. A mere theoretical opportunity for flight is not sufficient grounds for pretrial detention. *Himler,* 797 F.2d at 162 (possession of one false form of identification not enough by itself to justify pretrial detention in the absence of evidence that defendant actually intended to flee from prosecution).

■ Relevant factors that support a serious risk finding include the use of a number of aliases, unstable residential ties to a community, efforts to avoid arrest, or hidden assets. *Friedman,* 837 F.2d at 49. Evidence of a serious intent to flee the country in response to an indictment also justifies detention as a serious risk of flight. *United States v. Vortis,* 785 F.2d 327 (D.C.Cir.1986); *United States v. Koenig,* 912 F.2d 1190, 1193 (9th Cir.1990) (defendant detained as a flight risk because of substantial foreign contacts); *United States v. Cole,* 715 F.Supp. 677, 679 (E.D.Pa.1988) (defendants posed serious flight risk because they held and used foreign passports and told undercover agents they would flee if arrested). Of course, evidence that a defendant had already attempted to flee prosecution would certainly bolster a finding of a serious risk of flight, especially where the defendant had foreign contacts who could aid in his

flight. *United States v. Maull,* 773 F.2d 1479 (8th Cir.1985) (*en banc*).

■ In economic fraud cases, it is particularly important that the government proffer more than the fact of a serious economic crime that generated great sums of ill-gotten gains. Merely having access to significant funds is not enough; evidence of strong foreign family or business ties is necessary to detain a defendant even in the face of a high monetary bond. *See, e.g., United States v. Epstein,* 155 F.Supp.2d 323 (E.D.Pa.2001) (reversing magistrate judge's denial of detention; $1 million personal surety bond and electronic monitoring was not sufficient security based upon defendant's alien status and lack of ties to the United States); *United States v. Ishraiteh,* 59 F.Supp.2d 160 (D.Mass.1999) (detention appropriate for alien defendant charged with mail and wire fraud who had extensive family and employment ties with foreign entities and no family ties to the United States or district where charges pending).

## II. APPLICATION OF FACTORS FOR RISK OF FLIGHT

### A. Nature and Circumstances of the Offense Charged/Weight of the Evidence [6]

■ Giordano is charged in a multi-count indictment with serious economic crimes that all relate to a hedge fund investment scam. The indictment generally alleges that Giordano and others, through their hedge fund entity managed by EPG Limited Partners (an unindicted entity), fraudulently obtained investments from persons under the false pretense that the monies would be maintained and invested by the fund in securities and other investment sources. The indictment focus-

---

6. The first and second factors to consider under section 3142(g)(1) and (2) will be ad-

dressed together to streamline the discussion and avoid redundancy.

es on three investors who contributed about $4.5 million to the investment enterprise. Yet, Giordano did not manage the invested funds as represented and instead converted the monies for personal uses like expensive cars for him and his family, jewelry, and even the purchase of real estate. According to the Government, these investors have only seen a return of about $250,000 on the investments, and, even worse, those monies were distributed in Ponzi-like fashion from other investors' monies in a different scam Giordano operated.

The Grand Jury found probable cause in Count One of the indictment to charge Giordano with conspiracy to commit mail and wire fraud arising from this investment scam dated back to April 2001. *See* 18 U.S.C. §§ 371, 1341, 1343. This charge carries a maximum penalty of five years. The Grand Jury alleges that Giordano fraudulently invested less than twenty-five percent of investor funds in the purchase of securities and, instead, converted those funds for his personal gain.

Counts Two through Sixteen of the indictment allege that Giordano actually committed mail fraud on these investors. *See* 18 U.S.C. §§ 1341 and 2. Altogether, these charges carry a maximum penalty of up to five and/or twenty years imprisonment depending on the number and type of counts proven at trial. Counts Seventeen through Twenty–One charge Giordano with engaging in wire fraud. *See* 18 U.S.C. §§ 1343 and 2. Giordano faces a possible maximum of up to five and/or twenty years on these counts.

Finally, Counts Twenty–Two through Thirty–Five allege that Giordano knowingly engaged in monetary transactions, through various financial institutions, with the fraudulently-obtained funds, including deposits of monies into his personal brokerage and checking accounts, issuance of checks for cars and jewelry, and the wire transfer of funds for the purchase of real estate. *See* 18 U.S.C. §§ 1956–57. Giordano faces a possible maximum sentence on these money laundering charges of up to ten and/or twenty years.

Altogether, the Government proffers that Giordano faces a consecutive maximum sentence of up to eighty-five years. Under the advisory sentencing guidelines, the Government calculates that Giordano would likely face on these allegations, if proven, a possible range of 87 to 107 months imprisonment. (Trans. at 67–68). Of course, that calculation could be subject to reasonable departures either downward or upward. *See United States v. Booker,* —— U.S. ——, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005).

In sum, these are serious charges. The Government proffered that he engaged in this scam, even though he was already subject to prior regulatory proceedings by various agencies with regard to other financial shenanigans he was involved in. In connection with a prior hedge fund he managed, EPG Global Equity, he was barred from associating with any investment advisor or broker dealer. (Trans. at 16–17). It is alleged that following that administrative order Giordano continued to engage in transactions as an investor advisor through an entity that became general partner of his hedge fund (Broadmoor Asset Management). Giordano has also apparently been investigated by other federal and state agencies for similar hedge fund scams.

The Government's proffer also included allegations with respect to private placements related to the stock sale of a company called SCL Ventures that was ultimately supposed to acquire by a Chinese telecommunication company called Weida PRC. Giordano works for an affiliated entity, Weida Communications, and owns stock in that company. It is argued that

monies were fraudulently derived from these private placements in SCL Ventures, and the proceeds of which were also converted for personal gain, as well as used in part to make payments to the investors in the EPG Ltd. hedge fund after they complained that they were not getting what they bargained for. (Trans. at 10–11). Weida was supposed to have owned land-based satellites and contracts with persons in China that the investor would be contributing for their purchase. The Government proffered that some $14 million in investment monies were obtained, $10 million of which the Government alleges has been transferred for other purposes unrelated to the purchase of Weida PRC.

The Court notes, however, that the Government has not yet concluded its investigation into these other possible scams and has not yet sought to indict Giordano on these allegations. As the FBI agent who testified at the hearing explained, the Government has only begun to scratch the surface and limited the present charges to the EPG Ltd. hedge fund scam.

The evidence related to the pending charges is based upon financial records the Government has obtained that show the transfers of monies into Giordano-controlled accounts from the investors and the transfers of those monies for personal uses. The evidence in the case also includes the records of the hedge fund itself, which allegedly show that no material investments were ever actually made by the fund. Only twenty-five percent of the monies appear to have been legitimately invested, while the remainder is either unaccounted for or appears to have been used for non-investment purposes, like Giordano's cars and property. Moreover, the Government proffered that it has recorded telephone calls between Giordano and the investors, in which Giordano provided false excuses why the investors could not access their monies or obtain the return on their principal. The evidence also includes fraudulent statements that were provided to the investors, in which Giordano represented that the fund was investing their monies and that they were producing a return on those investments, when in fact the monies were actually being absconded.

In short, it appears that these are substantial charges and that the Government has amassed considerable evidence with which to prove them at trial. In any economic fraud case, of course, the evidence is often circumstantial, reliant on complicated accounting testimony, and subject to interpretation. The Government also has the difficult burden of proving criminal intent with respect to all these transactions to distinguish them from mere breaches of contract or fraudulent torts subject to civil jurisdiction. At the same time, the Court recognizes that there may also be very substantial defenses to these claims, as proffered by Giordano's counsel at the hearing. For instance, the agent who supported the Government's proffer acknowledged that there was much that the Government did not yet know or understand with respect to Giordano's transactions and that the investigation was continuing. (*E.g.,* Trans. at 51–56).

Nevertheless, based upon the Government's proffer there appears to be substantial evidence of serious federal crimes in this case. The Court finds that this evidence would at least satisfy the first two factors under section 3142(g) and justify detention based upon risk of flight, assuming of course that the other factors at issue supported that ultimate conclusion. *See United States v. Al-Arian,* 280 F.Supp.2d 1345, 1358 (M.D.Fla.2003) ("the stronger the government's case, especially if the sentence will be severe, the greater's incentive to flee").

On the other hand, the potential sentence is serious, but not severe. The Government estimates a range of seven to nine years for a 29–year old defendant. Giordano, if convicted on all counts, could receive a higher or lower sentence, of course. Given his lack of criminal history, however, there is reason to doubt that he would face a severe sentence. The number of victims at issue in this indictment is also limited (three). And, the amount of the loss, approximately $4.5 million, is significant but certainly not as significant as other cases that can unfortunately be found in this district. It appears that this case probably lies in the middle of the spectrum, enough to justify detention in some cases but not in others, again depending on other factors.

Nevertheless, even though Giordano will not be detained through this Order, the nature and seriousness of these charges and the possible incentive to flee a sentence of seven to nine years would require that the Court impose very stringent conditions on Giordano's bond. *See* 18 U.S.C. § 3142(c)(1)(B).

**B. History and Characteristics of the Defendant**

The third factor to consider is obviously very significant for any detention issue, as evidenced by the statute itself. Section 3142(g)(3) focuses on very specific items that the Congress intended for the judicial officer to address in making the detention/bond decision.[7] 1 will address those factors, categorized first by the factors that support Giordano's position, and then by the factors that support the Government's position.

**(1) Factors Weighing Against a Serious Risk of Flight**

The record now before the Court consists of the information gathered by the Pretrial Services Officer, as shown on her Report, and Giordano's proffer at the hearing. It should be noted that Pretrial Services recommended that Giordano be granted a bond in this matter, in the form of a corporate surety bond with conditions. Clearly, the following factors influenced that recommendation.

*Community Ties.* Giordano is a twenty-nine year old American citizen, born in New York but now resides in South Florida. He has lived in this community for the last six and half years, living previously in New York and other states. Since moving to Florida, he has lived in Deerfield Beach and Boca Raton. Giordano is recently married, and for the past 17 months has lived at his Boca Raton address with his wife. He recently purchased a substantial property in Davie Florida, where he and his wife are in the process of moving into. He does not report having any additional family members in the immediate area, nor does he have any children (a fact that does enhance in part the risk of flight). His mother and sister reside in New Jersey. His brother, Frank Giordano, resides in Staten Island, New York, and where he has a $500,000 residence that he is prepared to utilize to collateralize a bond for his brother. (Trans. at 92).

Giordano has some ties to Italy, apparently through his father who now lives in Italy; but Giordano has had no contact with him for the past eleven years. The

---

7. Section 3142(g)(3) requires an examination of "the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and ... whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law ...."

Government introduced no evidence to rebut this fact or to show that Giordano has any substantial family connections outside the United States that might facilitate foreign flight.

*Criminal History/Physical and Mental Condition/History of Drug Abuse.* Giordano has no record of any arrests or convictions that suggest he has ever abused alcohol or drugs. Indeed, he has no criminal history at all, except for a traffic offense that was Nolle Prossed in 2000. His wife also verified that he has no abuse history and that he is in otherwise good health.[8]

*Record of Appearances and Compliance With Bond/Probation/Parole Conditions.* Given the fact that Giordano has no criminal record, he has had no occasion to default in any way on any bond orders, nor has he ever been arrested or convicted of any criminal violation while on probation or parole. As these are specific items Congress believed significant for purposes of a section 3142(g) analysis, the absence of any of these factors weighs in Giordano's favor.

*No Use of Aliases or Evidence of Intent to Flee.* The Government did not proffer any evidence that Giordano has ever been known to use or trade in false identification or aliases. Nor has the Government proffered any evidence that Giordano has ever indicated any intent to flee from this investigation or any regulatory inquiry into his financial dealings. (Trans. at 81). This Court and others have looked to this particular factor as one that could tip the balance in favor of detention, especially in an economic fraud case where the criminal activity may have yielded considerable funds. The absence of this factor here certainly supports the presumption that

Giordano should be released on monetary conditions.

### (2) Factors Favoring a Serious Risk of Flight

Together with the presumption favoring pretrial release, the factors cited above weigh heavily in Giordano's favor and against pretrial detention in this case. The Government has the burden of proving by a preponderance of the evidence that the following factors tip the balance in the opposite direction.

*Financial Resources.* The strongest factor that the Government relies upon is Giordano's ability to finance flight from the proceeds of his fraudulent transactions. With respect to the alleged fraud that is relevant to this indictment, the Government alleges that only about 25 percent of those funds were actually invested, leaving the remainder for Giordano's personal benefit. As the Government also alleged, much of that money was spent on real and personal property for Giordano and his family. That would still leave a considerable sum available to Giordano to finance his flight from this prosecution.

Additionally, the Government alleges that he has obtained significant sums from other questionable transactions, such as the private placement referred to earlier, some of which the Government traced to three offshore accounts. The Government believes that he may have up to $800,000 available to him from these accounts. Giordano proffered, however, that those accounts were actually investment accounts with other investors, and that Giordano did not have immediate access to those funds.

---

**8.** As the Government points out, however, Giordano may not have been convicted of any crime but has been the subject of several regulatory proceedings and investigations related to his apparent penchant for investment scams. The Court will address that issue *infra* with respect to Section 3142(g)(4).

Giordano disclosed to Pretrial Services that he had about $70,000 in cash in his accounts, stock holdings of unknown value, a 2004 Mercedes valued at $100,000 (already seized by the Government), and his new residence in Davie, Florida, valued at about $1.94 million. There is a mortgage on that new property in the amount of $1.2 million. It should be noted, however, that the Grand Jury's indictment included a forfeiture allegation to seize property derived from the converted investment funds, for which the Government intends to levy on the Davie property. Thus, much of his disclosed properties may no longer be available for Giordano's use pending his trial.

Giordano did not disclose all his assets to the Pretrial Services officer. During the hearing he confirmed that he holds a 51 percent interest in a hotel located in Lake Worth, Florida, which he purchased for $6 million in 2003 (utilizing about $534,000 in cash derived from the private placement, according to the Government). Moreover, although the parties dispute what the present value of Weida stock he currently holds, there is no dispute that he owns a considerable amount of stock in that entity, in the millions of shares. Giordano rebuts the Government's proffer with respect to his stock ownership based upon the S.E.C.'s order suspending trading on that stock based upon their investigation. Additionally, the court has frozen all funds in Weida Communications bank accounts. Thus, Giordano argues that much of the Government's proffer based upon Weida assets is illusory at this point in time.

From the limited proceedings available to the Court on this matter, it is impossible to determine with any degree of certainty exactly how much money would be available to Giordano, if released on bond, to finance his flight. Giordano's possible access to offshore accounts is obviously troublesome. If the Government's allegations are true, Giordano would have already amassed a considerable amount of money from his fraudulent transactions that could be secreted away. Although much of those funds were already spent on houses and cars, the Court accepts the Government's proffer that he may have access to considerable sums to finance possible flight from this prosecution, notwithstanding Giordano's denials to the contrary.

*Foreign Contacts.* Although Giordano has considerable local and national community ties, it should be noted that the Pretrial Services report shows that he has had considerable foreign travel in the past few years, for business and pleasure. Those trips include several trips to China (ostensibly related to his Weida transactions), as well as Grenada, Bahamas, and countries in Europe. Additionally, as stated earlier, Giordano has family in Italy, although there is a question how much contact he actually maintains with that family.

That being said, there is no evidence proffered from the Government that he has any substantial ties to any other country through which he could flee the jurisdiction. Giordano has never lived outside the United States for an extended period and, even with the alleged $800,000 in funds available to him in offshore accounts, there is no compelling evidence that he has sufficient foreign funds available to him to finance an extended absence from this jurisdiction. In any event, this factor still supports, at least in part, the Government's position in this matter.

### C. Nature and Seriousness of Danger if Defendant Released

Although Giordano cannot be detained in this case based strictly upon a finding of dangerousness, *supra* at 6–10, section 3142(g)(4) requires that the Court assess the extent of the danger posed by a defendant's release in weighing the factors relevant to a risk of flight analysis. One obvi-

ous consideration is whether a defendant would continue to engage in criminal acts while on bond, which acts would produce the means by which the defendant could ultimately flee the prosecution. Conversely, a second consideration is whether a defendant would flee and then engage in criminal acts to finance his flight.

The Government here acknowledges that Giordano has no criminal history. Yet, the Government points the Court to a pattern of improprieties and outright scams that Giordano has been involved in, which have drawn the attention of the SEC, as well as other federal and state agencies. He has been ordered to refrain from having contacts with investment advisers or brokers, he has been prohibited from selling investments in Illinois and Washington, and he has now been prohibited by the SEC from selling any further shares related to Weida PRC. The Government argues that, notwithstanding his past run-ins with these regulatory authorities, Giordano has continued to engage in questionable practices and, now, criminal transactions.

 There can be no question that an economic danger, like that posed by a serial defrauder, falls under the broad umbrella of "dangerousness" as that term is used throughout the Bail Reform Act. *E.g.,* *King,* 849 F.2d at 487 (based upon the legislative history to the Act, "dangerousness" is not limited only to physical harm or injury). Thus, the Government is right that the Court must consider what effect

pretrial release would have has on the danger that Giordano would continue to engage in fraudulent activity while out on bond. This factor certainly weighs in favor of a detention order or at least stringent conditions of bond that would reasonably address, if possible, the danger posed in this case. Again, however, that consideration must still be grounded on the ultimate conclusion that Giordano would pose a serious risk of flight.

### III. ANALYSIS

The Court carefully weighed all these factors during the hearing prior to reaching its conclusion that detention was not warranted. Those factors have been reconsidered and reweighed in preparing this written order. Although reasonable persons may differ, the Court still concludes that detention is not warranted.

First, this is an economic fraud case where risk of flight is the central issue. Although the alleged crimes are serious, and large sums of money may be involved, many of the key factors that would warrant detention in an economic fraud case are absent here. Foremost among them is the absence of any proof or indication that Giordano intends to flee from this indictment. There has been no showing that Giordano would have any where to go outside of South Florida to flee, that he has any foreign contacts that could harbor him and help finance his flight, or that he has any history of using aliases or false identification.[9]

---

9. *See Himler,* 797 F.2d at 162 (mere theoretical opportunity for flight is not sufficient grounds for pretrial detention); *Vortis,* 785 F.2d at 327 (serious intent to flee is an important factor); *compare United States v. Sharma,* No. 03–80146–CR–Marra (S.D.Fla. May 24, 2004) (defendant detained in securities fraud action where "the Defendant has familial and business ties to India" and "the Defendant stated that if he ever got into any trouble, all he had to do was get on a plane to New Delhi, India, where he could easily secure a fraudu-

lent death certificate through his political connections and disappear"), *Cole,* 715 F.Supp. at 679 (defendants posed serious flight risk because they held and used foreign passports and told undercover agents they would flee if arrested), *and United States v. Burstyn,* No. 04–60279–CR–Zloch (S.D.Fla. Mar. 18, 2005) (ordering detention for defendant/lawyer with long-standing community ties who counseled clients to flee prosecution, which evidences a serious intent to flee from

Second, Giordano's ties to the community and absence of criminal record outweigh the Government's showing that he has financial resources with which to flee. He is an American citizen, has substantial properties in this community, and has substantial family ties here and elsewhere in the country that would all compel him to appear in Court and defend himself against these charges. Moreover, the lack of any criminal record in this case is certainly a strong factor favoring pretrial release, coupled with the related lack of history in missing court appearances or in failing to follow court orders, in a case where the section 3142(f)(1) presumptions do not apply.[10]

Together, these factors strongly support the presumption that Giordano should be able to obtain pretrial release on monetary conditions that would ameliorate the flight risk that exists in the case.[11] The Government's proof of how much monies Giordano actually had to finance his flight was conclusory at best. Clearly much of that money has already been spent on tangible goods, much of which has been or is being seized by the Government, and it is not at all clear what would be left in liquid assets for Giordano to utilize. It appears that a bulk of the fraudulently-obtained funds may have been used to finance his real estate holdings; however, those properties are subject to forfeiture proceedings at the present time and likely not available to obtain any material amount of funds necessary to finance flight.

Third, although Giordano has some contacts in foreign jurisdictions, those contacts are not, for instance, lifelong family ties that would bolster the risk of flight.[12]

Fourth, although these charges are indeed serious, Giordano is most likely not

his own prosecution), *with United States v. Hodge,* No. 03–80146–CR–Marra (S.D.Fla. Jun. 18, 2004) (affirming order denying pretrial detention in securities fraud case; no evidence of criminal record, significant foreign contacts, or any intent to flee from prosecution).

**10.** *Compare United States v. Devilliers,* No. 04–20159–CR–Gold (S.D.Fla. Apr. 12, 2004) (affirming denial of detention for defendant who spearheaded a gambling RICO enterprise based on lack of proof of serious risk of flight, no statutory presumption, and especially based on absence of criminal history), *with United States v. Rivera,* 90 F.Supp.2d 1338, 1343 (S.D.Fla.2000) (absence of criminal record standing alone is not enough to overcome the statutory presumption that applied to narcotics case), *and United States v. Bachynsky,* No. 04–20250–CR–Jordan (S.D.Fla. May 7, 2004) (ordering detention in economic fraud case for defendant with criminal history, history of extensive foreign travel, and insufficient local community ties).

**11.** *See United States v. Hammond,* 204 F.Supp.2d 1157, 1164 (E.D.Wis.2002) ("evidence of economic and social stability, coupled with the absence of any criminal record, at least suggests that defendant would be less likely to engage in criminal activity while on pretrial release") (quoting *United States v. Dominguez,* 783 F.2d 702, 707 (7th Cir. 1986)); *cf. United States v. Kisling,* 334 F.3d 734, 735 (8th Cir.2003) (defendant in mail fraud case detained based upon lack of community assets, history of evasion of service of process, and failures to appear in court proceedings); *United States v. Kerns,* No. 03–80146–CR–Marra (S.D.Fla. Nov. 7, 2003) (detention ordered in economic fraud securities case where defendant "has a history of fraudulent criminal activity that spans twenty-five (25) years.... The defendant's indicted activities, therefore, do not appear to be isolated instances of misjudgment; rather, they appear part of an on-going pattern of fraudulent activity.").

**12.** *Cf. Epstein,* 155 F.Supp.2d at 323 (ordering detention based upon defendant's alien status and lack of ties to the United States); *Ishraiteh,* 59 F.Supp.2d at 160 (detention appropriate for alien defendant charged with mail and wire fraud who had extensive family and employment ties with foreign entities and no family ties to the United States or district where charges pending).

facing a lifelong sentence, and would likely face, if convicted, the seven to nine year sentence that the Government now estimates. Moreover, he understands that if he were to flee, he would be subject to prosecution upon the inevitable recapture for bail jumping, which charge carries a maximum penalty of up to fifteen years—much longer than he was originally realistically facing on this indictment. *See* 18 U.S.C. § 3146(b)(1)(A)(1). Additionally, to the extent there is any danger posed by releasing him for trial, that danger may be ameliorated through an Order precluding him from engaging in any hedge fund or other investment transactions, directly or indirectly, while on pretrial release.

Fifth, and most importantly, the Court finds that there are conditions or combination of conditions that would minimize the risk of flight that is present in this case. A $1 million dollar bond will be required, consisting of a personal surety bond of $500,000 for which the brother's property would be used as collateral, in addition to a $500,000 corporate surety bond with a *Nebbia* requirement that would further tie up his assets and facilitate his recapture if he chose to flee. Additionally, the Court will order that he be confined to house arrest and monitored electronically to, again, facilitate his arrest were he to flee. The Court notes that its review of other cases pending in the District shows that similar conditions of bond are routinely applied in similar cases, including ones that involve much higher alleged losses and potential sentences.[13]

Finally, the Court finds that the Government has not satisfied its burden of persuasion in this case that Giordano poses a serious risk of flight under section 3142(f)(2)(A). The motion for detention, accordingly, was and is denied.

### IV. CONCLUSION

For the foregoing reasons, it is hereby ORDERED AND ADJUDGED:

1. The Government's motion for detention is hereby DENIED.

2. This Order is hereby STAYED pending the District Judge's review of the Government's appeal.

---

13. *Compare United States v. Valdes,* No. 04–20828–CR–Jordan (S.D. Fla. Dec. 17, 2004) (reversing order of detention in health care fraud case in favor of corporate and personal surety bonds where losses alleged only amounted to $3 million, strong community ties, and no criminal history), *with United* States v. Salter, No. 99–8110–CR–Hurley (S.D.Fla. Nov. 5, 1999) (ordering detention of defendant in economic crime case who was foreign citizen with substantial means and extensive history of international travel; $5 million bond not sufficient to overcome serious risk of flight).