UNITED STATES of America

v.

Agron ABDULLAHU.

No. 07–2050 (JS).

United States District Court,
D. New Jersey,
Camden Vicinage.

May 24, 2007.

*OPINION DENYING DEFENDANT'S MOTION FOR RELEASE ON BAIL AND IN SUPPORT OF DETENTION ORDER*

SCHNEIDER, United States Magistrate Judge.

This matter is before the Court on the request of defendant Agron Abdullahu (hereinafter "defendant") for a detention hearing pursuant to 18 U.S.C. § 3142(f). On May 14, 2007, defendant filed his "Motion for Release on Bail." [Doc. No. 10]. Pursuant to 18 U.S.C. § 3142(f) the Court held a detention hearing on May 17, 2007. For the reasons to be discussed, the Court denies defendant's Motion and finds that no condition or combination of conditions will reasonably assure the appearance of the defendant as required and the safety of any other person and the community.[1] Pursuant to the requirements of 18 U.S.C. § 3142(i) this Opinion will set forth the Court's written findings of fact and a written statement of the reasons for the detention.

*Background*

On May 7, 2007, this Court signed a Complaint [Doc. No. 1] and Arrest Warrant [Doc. No. 2] naming defendant. The Complaint charges defendant with violating 18 U.S.C. § 922(g) and 2. Contemporaneously with the issuance of these documents the Court also signed five related Complaints and Arrest Warrants naming Eljvir Duka (07–2047(JS)), Mohamad Ibrahim Shnewer (07–2045(JS)), Dritan Duka (07–2046(JS)), Shain Duka (07–2048(JS)) and Serdar Tatar (07–2049(JS)). (These five (5) individuals will hereinafter be referred to as the "other charged individu-

Lisa Evans Lewis, Office of the Federal Public Defender, Camden, NJ, for Agron Abdullahu.

Robert Stephen Stigall, Office of the U.S. Attorney, Camden, NJ, for United States of America.

1. At the conclusion of the May 17, 2007 detention hearing this Court ruled from the Bench and read into the record the sum and substance of this Opinion. This written Opinion formalizes the Court's ruling. A detention Order was entered on May 17, 2007. [Doc. No. 14].

als.") Defendant and the other charged individuals were arrested on May 7, 2007 and pursuant to Fed.R.Crim.P. 5, appeared before this Court for an initial appearance on May 8, 2007. On that date an Order of Temporary Detention was entered and a detention hearing was scheduled for May 11, 2007. [Doc. No. 7]. On May 11, 2007, defendant's counsel requested and was granted an extension for the date of the detention hearing until May 17, 2007.

*Findings of Fact*[2]

In order to understand and appreciate the nature, circumstances and background of the charges against defendant it is necessary to set forth a comprehensive summary of the relevant evidence. Defendant is charged with violating 18 U.S.C. § 922(g)(5) and 2. The essence of the charge is that defendant aided and abetted the receipt or transportation of firearms in interstate commerce by three (3) aliens. Section 2 of the charge treats as a principal a person who aids or abets an offense against the United States or willfully causes an act to be done that is an offense against the United States. Defendant is charged with providing firearms to Dritan Duka, Eljvir Duka and Shain Duka, all of whom are illegal aliens.

The charges against defendant arise in the context of the government's claim that the five other charged individuals conspired to attack soldiers or other personnel at the United States Army Base in Fort Dix, Burlington County, New Jersey. The government's investigation started after it learned that an individual brought to a local store a video to be duplicated onto a digital video disk ("DVD"). The video depicted conduct that was recorded as having occurred on January 3, 2006. The government describes the video as showing "men shooting assault weapons at a firing range in a militia-like style while calling for *jihad* and shouting in Arabic 'Allah Akbar'('God is Great')."[3] The government identified defendant in the video. Thereafter, the FBI and Joint Terrorism Task Force undertook an investigation of the activities of defendant and the other charged individuals.

Defendant and the other charged individuals were under close surveillance from March 2006 until their arrest on May 7, 2007. During that time two cooperating witnesses (CW–1 and CW–2) earned the trust of defendant and the other charged individuals and ultimately learned about the plan to attack Fort Dix. During the surveillance the other charged individuals discussed their willingness and intent to participate in the attack. It is not alleged that defendant stated he would participate in the actual attack. Albeit, on August 13, 2006, Shnewer told an informant that defendant was a member of the attack group. *See* Complaint at ¶ 18.

Although the government did not proffer direct evidence that the defendant specifically knew the other charged indi-

---

**2.** All of the facts summarized herein were included in the government's proffer at the May 17, 2007 detention hearing which included the May 7, 2007 Complaint naming the defendant and the reports of Pretrial Services. The proffer also included a transcript of a secretly recorded conversation between defendant and a confidential informant on February 6, 2007, and an interview the defendant gave after he was arrested and after he waived his *Miranda* rights. Other sources for the Court's findings of fact include the testimonial evidence at the May 17, 2007 detention hearing and the defendant's proffer. The rules concerning the admissibility of evidence in criminal trials do not apply to the presentation and consideration of information at a detention hearing. *See* 18 U.S.C. § 3142(f).

**3.** The government defines *jihad* as "a Muslim holy war or spiritual struggle against infidels." *See* Complaint at ¶ 1 n. 1.

viduals were planning to attack Fort Dix, defendant was in their company on several occasions when plans for the attack were more likely than not discussed or preparations for the attack took place. For example, defendant appeared in the shooting video at the Pocono Mountain firing range that was taken on January 3, 2006. Further, approximately one (1) year later, between January 31 to February 1, 2007, defendant was also observed (via video and photographic surveillance) carrying "dark colored rifle style bags" into Dritan Duka's residence. An informant also reported that defendant brought two firearms, a 9 millimeter handgun and a Yugoslavian semi-automatic rifle, to Dritan Duka's residence. Law enforcement officers also observed Shain Duka transfer a green rifle style soft case from Dritan Duka's residence to defendant who then loaded it into his vehicle. CW–2 also reported that defendant loaded a shotgun and Beretta rifle into his car. *Id.* at ¶¶ 47, 48. This informant, defendant and most of the other charged individuals drove to the Pocono Mountain home the Duka brothers rented. Law enforcement officers continued their surveillance and observed defendant participating in shooting practice on February 2, 2007 and "teaching" several individuals where to place a shotgun when firing it. *Id.* at ¶ 50. The weapons used included an SKS semi-automatic rifle, a Beretta storm semi-automatic rifle, a Mossberg 12 gauge pump shotgun and a 9 millimeter Beretta handgun. Defendant admitted he bought ammunition used in the Pocono training.

Even though defendant argues "there are no allegations in the complaint indicating that [he] ... knew of the Duka brothers' status as illegal aliens" (*see* Brief at 6–7), contrary evidence exists. After he was arrested, defendant admitted he kept a 9 millimeter Beretta rifle and a shotgun given to him by the Duka brothers because he knew they were illegally in the United States and could not possess firearms. In addition, the Dukas also told CW–2 they kept their firearms with several individuals, including "Agron", who law enforcement officers determined is defendant. CW–2 also recorded a meeting on January 19, 2007 where Dritan Duka explained that defendant brought weapons to the Duka brothers because the brothers had "green cards" and could not have firearms.

Shnewer, Dritan Duka, Eljvir Duka, Shain Duka and Tatar are charged with violating 18 U.S.C. §§ 1114 and 1117. The government alleges these individuals conspired to kill an officer or employee of the United States (including any member of the uniformed services) while the officer or employee was engaged in the performance of official duties. The charges carry a potential term of life imprisonment. According to the relevant Complaints, the alleged overt acts in support of the conspiracy include firearms training, surveillance at Fort Dix and other federal facilities, acquiring a map of Fort Dix, collecting weapons to be used in small arms training, reviewing terrorist videos, conducting tactical training, and ordering fully automatic machine guns as well as M–16 firearms and handguns. Defendants Driton Duka, Eljvir Duka and Shain Duka are also charged with violating 18 U.S.C. § 922(g) and 2. Dritan Duka and Shain Duka were arrested on May 7, 2007 after they purchased three AK–47 fully automatic machine guns and four M–16 rifles from undercover agents.

At the May 17, 2007 detention hearing the government submitted its evidence by proffer as is its right. *See* 18 U.S.C. § 3142(f); *United States v. Delker,* 757 F.2d 1390, 1395 (3d Cir.1985). The defendant presented the live testimony of his parents, Sejdulla and Vaxhide Abdullahu,

his sister, Ylberin Abdullahu, and Ray Millian, a family friend and former supervisor at a supermarket Millian and defendant worked at together.[4]

*Discussion*

The defendant's right to bail is addressed in the Bail Reform Act of 1984 (18 U.S.C. §§ 3141, et seq.), which was effective October 12, 1984. Generally, a defendant must be released on bail on the least restrictive condition or combination of conditions that will reasonably assure the defendant's appearance and the safety of the community. *See* 18 U.S.C. § 3142(c)(B). Pursuant to 18 U.S.C. § 3142(e), however, if after a detention hearing a court determines that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community" the court must Order the detention of the person before trial. If the government moves for detention on the basis of danger to the community, it must prove this by clear and convincing evidence. *Id.* at § 3142(f). A recent Third Circuit case cited with approval the definition of clear and convincing evidence summarized by the Supreme Court of New Jersey:

> [Clear and convincing evidence] produce[s] in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established, evidence so clear, direct and weighty and convincing as to enable [the factfinder] to come to a clear conviction without hesitancy, of the truth of the precise facts in issue.

*See United States v. Askari,* 222 Fed. Appx. 115, 2007 WL 1073698 (3d Cir.2007)(quoting *In re Jobes,* 108 N.J. 394, 408, 529 A.2d 434 (1987)). *See also United States Fire Ins. Co. v. Royal Ins. Co.,* 759 F.2d 306, 309 (3d Cir.1985); *United States v. Montague,* 40 F.3d 1251, 1255 (C.A.D.C.1994) (clear and convincing evidence "generally requires the trier of fact, in viewing each party's pile of evidence, to reach a firm conviction of the truth on the evidence about which he or she is certain"). The government may move for detention on the basis of danger to the community only for an offense that is listed in 18 U.S.C. § 3142(f)(1)(A) to (E). In this case the government may move for detention on dangerousness grounds because defendant is charged with an offense

---

4. Defendant asserted two evidentiary objections at the detention hearing that will be addressed. First, defendant objected to the government's transcription of his February 6, 2007, secretly recorded conversation. *See* U.S. Brief at 6–7. Defendant argued the reference to "raid" should be "race." This objection is irrelevant to the Court's decision since the referenced portion of the transcript was not relied upon. Second, defendant argued the government should not be permitted to rely upon the surveillance of defendant unless it produced the actual video recordings. The court overruled this objection for two reasons. First, defendant waived his objection since the first time it was asserted was in the middle of the May 17, 2007 detention hearing. Defendant was on notice of the government's proffer at least as early as May 8, 2007, and if he wanted to view the actual surveillance tapes before the detention hearing the request should have been made earlier. Second, the defendant's video surveillance was only part of the government's proffer. Even if the surveillance was not relied upon by the government the Court's decision would not have been different. In lieu of the video the Court could have just relied upon the fact that defendant admitted he went to the Poconos in January 2006 and February 2007 and that he supplied guns to the Dukas who he knew were illegal aliens. Further, this Court made an independent determination of the reliability of the government's proffer and determined that the proffer was sufficiently reliable that live testimony was not necessary. *See United States v. Accetturo,* 783 F.2d 382, 389 (3d Cir.1986); *United States v. Delker,* 757 F.2d 1390, 1396 (3d Cir.1985).

that "involves the possession or use of a firearm". *See id.* at 3142(f)(1)(E).[5]

If the government or court believes detention is appropriate because there is a risk of flight, this must be proved by a preponderance of the evidence. *United States v. Himler*, 797 F.2d 156, 161 (3d Cir.1986). The preponderance of the evidence standard requires the trier of fact to believe that the existence of a fact is more probable than its nonexistence. *In re Winship*, 397 U.S. 358, 371, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970) (Harlan, J., concurring). The District of Columbia Circuit has pointed out that the preponderance of the evidence standard is often misinterpreted to require an abstract weighing of the evidence to determine which side produced the greater quantum. *Montague, supra*, 40 F.3d at 1254. However, a more accurate description of the preponderance of the evidence standard is "evidence which as a whole shows that the fact sought to be proved is more probable than not." *Id.* at 1255 (quoting *Black's Law Dictionary* 1182 (6th Ed.1990)).

If the conditions in 18 U.S.C. § 3142(e) are met a rebuttable presumption arises that no condition or combination of conditions will reasonably assure the safety of any other person in the community. If a rebuttable presumption applies the defendant carries the burden of production to come forward with evidence to rebut the presumption. The defendant's obligation to come forward with evidence does not shift the burden of persuasion to defendant. *United States v. Perry*, 788 F.2d 100, 114 (3d Cir.1986). In this case, the government concedes the defendant is not charged with a rebuttable presumption offense.

The factors a court must consider in determining whether there are conditions of release that will reasonably assure the appearance of a defendant as required and the safety of any other person in the community are set forth in 18 U.S.C. § 3142(g). They include the nature and circumstances of the offense charged, including whether the offense is a crime of violence or a federal crime of terrorism, the weight of the evidence against the defendant, the history and characteristics of the defendant and the nature and seriousness of the danger to any person or the community that would be posed if the defendant is released.[6] A danger to the com-

---

5. This provision, added by the Adam Walsh Child Protection and Safety Act of 2006, Pub.L. No. 109–428 (effective July 27, 2006), amended the Bail Reform Act to include cases involving firearms as among those for which the United States may move for pretrial detention.

6. Specifically, the statute reads:

   (g) *Factors to be considered.*—The judicial officer shall, in determining whether there are conditions of release that will reasonably assure the appearance of the person as required and the safety of any other person and the community, take into account the available information concerning—
   (1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence, a Federal crime of terrorism, ...;

   (2) the weight of the evidence against the person;
   (3) the history and characteristics of the person, including—
      (A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and
      (B) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and
   (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release. In

munity does not only include physical harm or violent behavior. The concept of "safety" may include non-physical harm. *United States v. Giampa,* 904 F.Supp. 235, 358 (D.N.J.1995); *United States v. Provenzano,* 605 F.2d 85, 95 (3d Cir.1979) (holding that "[a] defendant's propensity to commit crime generally, even if the resulting harm would be not solely physical, may constitute sufficient risk of danger to come within contemplation of [the Bail Reform Act]"); *see also* S.Rep. No. 225, 98th Cong., 2d. Sess. 12, reprinted in 1984 U.S.Code Cong. & Ad. News 3182, 3195 ("The [Judiciary] Committee intends that the concern about safety be given a broader construction than merely danger of harm involving physical violence"). In assessing a defendant's danger to the community courts typically look at the nature and circumstances of the crime, the presentence report, the defendant's prior criminal record, pending charges and any other factors indicative of the defendant's propensity to commit crime generally or otherwise to endanger the community. *United States v. Provenzano, supra,* 605 F.2d at 96. Factors courts typically look at to assess a defendant's risk of flight include the nature and circumstances of the offense, the defendant's family ties, employment status and financial resources, the defendant's character and mental condition, the length of defendant's residence in the community, any prior criminal record and any flight or failures to appear in court proceedings. *United States v. Bissell,* 954 F.Supp. 903, 907 (D.N.J.1997); *United States v. Giampa,* 904 F.Supp. at 358. Other factors to examine are the use

of aliases, unstable residential ties, efforts to avoid arrest and hidden assets. *United States v. Giordano,* 370 F.Supp.2d 1256, 1264 (S.D.Fl.2005).

In order to decide whether to detain a defendant a fact intensive analysis must be done. The Third Circuit has noted, "[e]ach case … is *sui generis,* and must be decided on the basis of the particular record deduced." *United States v. Traitz,* 807 F.2d 322, 325 (3d Cir.1986). Pursuant to 18 U.S.C. § 3142(g), the Court will undertake to examine four (4) statutory factors to determine if detention or bail is appropriate.

### (1) *Nature and Circumstances of the Offense Charged*

The first factor this Court must examine to determine if the defendant should be detained or if bail should be granted is the "nature and circumstances" of the offense charged. The Court deems it significant that its analysis is not limited to simply examining the "offense" charged. By directing a Court to examine the "nature and circumstances" of the charge rather than just the charge itself, Congress intended for courts to examine a defendant's actions in the context of all relevant background evidence. For example, in *United States v. Benevolence International Foundation, Inc.,* 222 F.Supp.2d 1005 (N.D.Ill. 2002), a perjury case, the court did not simply look at the defendant's perjury allegations. Instead, the court examined the charge in view of the circumstances in which it arose. This caused the court to write, "this is not a simple perjury case. It is a perjury case in the context of a

considering the conditions of release described in subsection (c)(1)(B)(xi) or (c)(1)(B)(xii) of this section, the judicial officer may upon his own motion, or shall upon the motion of the Government, conduct an inquiry into the source of the property to be designated for potential forfeiture

or offered as collateral to secure a bond, and shall decline to accept the designation, or the use as collateral, of property that, because of its source, will not reasonably assure the appearance of the person as required.
18 U.S.C. § 3142(g).

terrorism financing investigation". *Id.* at 1006. In this case, it is misleading to view this as a "typical" case where a defendant is charged with supplying firearms to illegal aliens. The Court, therefore, rejects defendant's characterization that, "[t]he only evidence alleged against [defendant] in the complaint is that he allowed three illegal aliens, ..., to possess two firearms and ammunition lawfully belonging to him." *See* Defendant's Brief at 4. The Court also rejects defendant's assertion that he "only facilitat[ed] the possession of a firearms offense and nothing else." *Id.* at 5. In this case, the government alleges defendant "supplied weapons to a radical Islamic and *jihadist* group who conspired to kill and attempt to kill uniformed military personnel." *See* Brief at 13. At a minimum, defendant's actions must be viewed in the context that he was an important conduit to help the other charged individuals carry out a terrorist attack on U.S. soil.

Furthermore, it must be kept in mind that defendant did not simply supply guns to the Dukas on one occasion. The evidence plainly indicates that defendant participated in two shooting exercises in the Pocono Mountains and he knowingly brought firearms to and received firearms from the Dukas' home. Defendant admitted in his post-arrest interview that he provided the 9 millimeter Beretta handgun and an SKS semi-automatic rifle to the Dukas that were used during the January 2006 and February 2007 firearms training trips in the Poconos. He also admitted that the night before the February 2007

trip, he and Shain Duka traveled to Philadelphia where Shain Duka took possession of a 9 millimeter Beretta rifle from an unknown male at a pizza shop. The defendant, Shain Duka and this unknown male then traveled to a storage facility near the pizza shop where the unknown male gave defendant the shotgun used in the February 2007 Pocono trip.[7]

The circumstances surrounding the charges against defendant also demonstrate that defendant was an integral part of the plan to attack Fort Dix. Defendant supplied and stored the firearms the Dukas used and he taught them how to use firearms. Defendant argues he did not know the other charged defendants were planning to attack Fort Dix. However, defendant had close connections to the other charged individuals going back as far as January 2006 and lasting at least through February 2007. It is not a stretch to infer that the attack plans were discussed when the defendants and the other charged individuals met at the Dukas' home and in the Poconos, or on some other occasion. This is especially true in view of the fact that the other charged individuals willingly discussed their attack plans with the two confidential informants who they did not know as long or as well as defendant.[8]

The Court deems it significant that in 18 U.S.C. § 3142(g), the statute specifically mentions that a Court should examine if the offense charged is a "federal crime of terrorism." This indicates that Congress viewed this charge as an especially serious offense. A "federal crime of terrorism" is defined in 18 U.S.C. § 2332b(g)(5). Sec-

---

7. Although defendant characterized his trips to the Poconos as "vacations", the other charged defendants viewed the trips as training exercises for their planned attack on Fort Dix. *See* Complaint at ¶¶ 10, 12, 26 and 55.

8. In paragraph 5 of the Complaint it is averred that only two months after CW-1

infiltrated the group, Shnewer showed him *jihadist* recruiting videos. Based on the government's proffer the defendant spent time with Shnewer at least sixteen (16) months before defendant's arrest. It is not unreasonable to infer, therefore, that Shnewer also attempted to "recruit" defendant.

tion 2332b(g)(5) defines a "federal crime of terrorism" as an offense "that is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct" and is a violation of one of a number of other statutes, including 18 U.S.C. § 1114, the statute the other charged individuals are charged with conspiring to violate. Although the defendant is not charged with this crime, he supplied firearms to aliens in the context of a "federal crime of terrorism."

Even if defendant did not specifically know an attack was planned on Fort Dix, the evidence demonstrates that defendant had to have known that some type of significant dangerous illegal activity was being planned. The defendant was present when videos were shown in the Poconos depicting attacks on U.S. soldiers. He was also present at two firearms training sessions in the Poconos. He was also present when the government alleges "Mujahideen and terrorist training videos" were shown. *See* Brief at 5. Although not inconceivable, in this Court's view it defies logic not to infer that defendant knew the firearms and training he gave the other charged individuals was going to be used to further illegal activity with potentially dangerous consequences.

In view of the admissions defendant made in his post-arrest interview, and the corroborating admissions the Dukas made to the informants, defendant knew the Dukas were illegal aliens. The ultimate determination on this issue awaits trial. Nevertheless, for the reasons already discussed, the Court believes the evidence indicates that defendant knew the Dukas' immigration status and he willingly and knowingly participated in a plan to supply the Dukas with firearms with knowledge that they were engaged in illegal activity.

### (2) *Weight of the Evidence*

The second factor this Court must examine in its detention analysis is the "weight of the evidence." This Court is well aware that defendant is entitled to the presumption of innocence and he has not yet had an opportunity to rebut the government's charges. Furthermore, this Court is, of course, not judging defendant's guilt or innocence. Nevertheless, the Court believes the evidence to support the government's charge is strong and the "weight of the evidence" factor weighs in favor of detention. To a large extent the charges against defendant are based on his own statements, video surveillance and tape recordings. To the extent the government's case is based on what defendant calls "paid informants", this does not significantly detract from the government's case since no evidence exists to demonstrate that the informants are unreliable. *See United States v. Goba*, 240 F.Supp.2d 242, 248 (W.D.N.Y.2003)(general assertions of unreliability, standing alone, are insufficient to require the government to produce live testimony in the absence of any other obligation to do so).

### (3) *History and Characteristics of the Defendant*

The third factor this Court must examine in its detention analysis is the history and characteristics of the defendant. The evidence shows defendant is 24 years old and he co-owns a home with his mother in Williamstown, New Jersey. Defendant lives with his mother, father, sister and brothers. Defendant emigrated to this country in 1999 and although he is not a United States citizen he is a lawful permanent resident. Defendant has no criminal record. Defendant has worked in the bakery of a local supermarket chain since approximately 1999. By all accounts defendant is a hard working and conscien-

tious employee. Defendant presented four (4) witnesses at the detention hearing who attested to his good character.

This Court does not doubt the sincerity of defendant's witnesses and the affection they feel for him. Nevertheless, the Court believes the defendant's history and characteristics weigh in favor of detention. The Court rejects defendant's argument that his risk of flight is "non-existent." *See* Brief at 10. While it is true defendant lives in New Jersey and co-owns a home here, he also has ties overseas. It has been proffered to the Court that defendant's father owns a home in Kosovo. Indeed, it appears that defendant's father left the United States to visit Kosovo on May 4, 2007, but returned to the United States when he learned defendant was arrested. Defendant also has relatives who live overseas who could provide a place for him to reside. The fact that defendant can apparently sustain himself abroad weighs in favor of detention. *Goba*, 240 F.Supp.2d at 251.

The Court does not believe defendant's ties to this area are strong enough to negate his incentive to flee. It is true defendant had recent steady employment but there is no guarantee that if released he will have a job. Furthermore, the Court does not believe the mere presence of defendant's immediate family in New Jersey is sufficient to assure his presence at trial. It is clear to the Court that defendant has the motive and means to flee if he is released. This is especially true, as the government points out, because if defendant is convicted he faces deportation.[9] Albeit, it is not certain where he will be sent. The threat of a long prison term, coupled with an involun- tary deportation, creates a substantial incentive for defendant to flee.

Although no two cases are identical, this Court believes the decision in *United States v. Ruiz–Corral*, 338 F.Supp.2d 1195 (D.Colo.2004), is sufficiently analogous to provide support for the Court's decision. In that case the defendant was indicted for possessing methamphetamine and possession of a firearm during a drug trafficking crime. After the Magistrate Judge granted the defendant bail, the government appealed. On appeal the District Judge reversed and detained the defendant. In *Ruiz–Corral*, the defendant was a U.S. citizen but still had relatives who lived in Mexico. The defendant was also described as a "dutiful employee" who held a job for five years. Various neighbors testified about the defendant's "ties" to the community and his "good neighborliness." Defendant also had no record of previous felony convictions. In addition, the defendant agreed to post his home as security for the bond to secure his appearance. *Id.* at 1198–99. Despite this evidence, the court held that defendant was a risk of flight and ordered him detained. *See also United States v. Caniglia*, No. CR 02–188–01, 2002 WL 32351181, at *3–4 (E.D.Pa.2002)(ruling that defendant should be detained even though he presented 38 witnesses who attested to their belief that he would appear for trial and would not be a danger to the community); *United States v. Corzo*, 887 F.Supp. 285, 287 (S.D.Fla.1995)(defendant was a flight risk even though he was a resident alien since 1971 and had not traveled outside the United States since that time, he resided in the community, and he lived with his mother and eight year old daughter);

---

**9.** Pursuant to 8 U.S.C. § 1227, a legal permanent resident can be deported from the United States if convicted of an aggravated felony. An aggravated felony includes, "an offense described in ... Section 922(g)(5) of Title 18 [relating to firearms offenses]." *See* 8 U.S.C. § 1101(a)(43)(E)(i).

*United States v. Caba,* Crim. No. 88–435(SSB), 1989 WL 200447 (D.N.J.1989)(defendant detained even though he had no history of violence and no criminal record).

Defendant argues his "community ties" weigh in favor of release. However, Congress has cautioned against relying too heavily on family and community ties. *See Caniglia* at 2002 WL 32351181, *4. The Judicial Committee advised that

> [The Committee] is aware of the growing evidence that the presence of [community ties] does not necessarily reflect a likelihood of appearance and has no correlation with the question of the safety of the community. While the Committee considered deleting the factor altogether, it has decided to retain it at this time. However, the Committee wishes to make it clear that it does not intend that a court conclude there is no risk of flight on the basis of community ties alone; instead a court is expected to weigh all the factors in the case before making its decision as to risk of flights and danger to the community.

*Id.* (citing S.Rep. No. 225, 98th Cong., 1st Sess., 24–25); *United States v. Merlino,* No. 99–363, 1999 WL 557943, at *3 (E.D.Pa.1999)(the legislative history of the Comprehensive Crime Control Act of 1983 indicates that Congress found that community or family ties do not and should not weigh heavily in the risk of flight analysis). In addition, while defendant is a resident alien and in the United States legally, he still has ties to Kosovo or Macedonia. If defendant were to flee to either country, in all likelihood he could not be extradited to face trial in this matter. The government has proffered that the offense charged is not an extraditable offense under the extradition treaty between Macedonia and the United States. *See* Brief at 18. Also,

Macedonia will not extradite one of its nationals. *Id.* The inability to extradite defendant should he flee weighs in favor of detention. *See United States v. Epstein,* 155 F.Supp.2d 323 (E.D.Pa.2001) (finding that defendant's dual citizenship in Germany and Brazil, lucrative employment and property interests, and lack of an extradition treaty with Brazil weighed in favor of detention despite the fact that defendant's family lived in the United States and he owned valuable property in this country).

This Court is also mindful that an indictment has not yet been issued and that the government's investigation is continuing with regard to this defendant. At the moment the defendant faces a potential prison term of ten (10)years, which is significant. The government (5–7 years) and defendant (1–2 years) differ on the defendant's potential sentence under the applicable Sentencing Guidelines. However, even if defendant faces a sentence of only a few years in prison this does not dispel his substantial motive to flee. *See Epstein, supra* (prison term of 2–4 years created incentive for defendant to flee to Brazil where he had ties). The fact that defendant may possibly be indicted for other offenses creates another incentive to flee. This was discussed in *United States v. Benevolence International Foundation, supra,* 222 F.Supp.2d at 1007, where the court ruled that defendant should be detained based on a perjury charge in the context of a terrorism financing investigation. The court based its decision to detain the defendant, in part, on the following reasoning which this Court finds persuasive:

> In these circumstances, and given the post 9/11 climate in this country, regardless of Defendant's actual guilt or innocence of all this, the natural human tendency has to be for Defendant to apprehensively feel he's in a diffi-

cult and opprobrious situation, from which flows an incentive and risk for flight.

### (4) *Nature and Seriousness of the Danger to Any Person or the Community*

The fourth factor this Court must examine in its detention analysis is the nature and seriousness of the danger to any person or the community if defendant is released. This factor also weighs in favor of detention. The evidence demonstrates that defendant is experienced in the use of firearms and knowingly assisted illegal aliens who he knew were involved in illegal activities with potentially deadly consequences. This indicates defendant is willing to be involved in significant criminal activity. The fact that the defendant has not been previously arrested does not dispel the danger that would result if he was released. It is also noteworthy that defendant admitted in his post-arrest interview that he was present when Shnewer showed *"jihadist* videos" which showed Al Qaeda killing U.S. soldiers in Iraq. Defendant was also present in the rented Pocono home in February 2007 when those present viewed what has been described as terrorist training videos. In addition, defendant admitted he had a conversation with one of the Duka brothers where the brother discussed attacking a military base. The fact that defendant continued to associate with and assist the other charged individuals in view of this knowledge evidences that he is a danger to the community.

Defendant argues the community will not be endangered if he is released because he will be subject to home confinement and electronic monitoring. However, electronic monitoring and home confinement do not guarantee that defendant will not flee or endanger the community. Electronic monitoring impedes but does not prevent a defendant from fleeing. *See United States v. Orena,* 986 F.2d 628, 632–33 (2d Cir.1993); *United States v. Gotti,* 776 F.Supp. 666, 672–73 (E.D.N.Y.1991). *See also United States v. Benevolence International Foundation, supra,* 222 F.Supp.2d at 1007 (electronic surveillance systems can be circumvented and the monitoring equipment can be rendered inoperative; electronic monitoring does not stop a person from fleeing). Defendant also argues that his significant family and community ties support his contention that he is not a danger to the community. However, as discussed *infra,* community ties is not necessarily correlated with whether a defendant is a danger to the community.

Contrary to the picture defendant attempts to portray, the facts show that defendant poses a significant danger to the community. The fact that defendant supplied and stored firearms for the other charged individuals, he bought ammunition for them, and trained them on how to use firearms, is strong evidence of his danger. Furthermore, defendant is a licensed firearms user and even boasted to an informant about his ability to make explosives and his willingness to use them if necessary. Excerpts from defendant's conversations include the following statements concerning his knowledge of explosives:

> ... If you get fat, heat it up, evaporate it. Cool it down. You will get a nice bullet. The most explosive and the most unstable explosive in the world. It's very powerful but very unstable ...
>
> I tried. You have to have the f.....g chemistry. You have to have the perfect temperature. You have nitroglycerin. You can make a bomb with the f.....g ammonium. F.....g Windshield viper ... Burns like f.....g gasoline.
>
> In a f.....g bottle. You can use it in an assault....

(In response to the cooperating witness' question how Abdullahu knew so much about bombs) "I love that s..t. I looked for it, I learnt about it ... *I like to know everything in case very time comes. Because if the times. If any moment if somebody turns against me. If they turn against me, I would have a fighting chance.* You don't have to have that f.....g military [stuff] to making bombs. You can break into f.....g house and steal stuff to make a bomb. You can break into a gun store and steal the stuff and make the bomb ... I can break into the Home Depot and make a f.....g bomb. Make a f.....g bomb ... RPG [rocket propelled grenade] thing? It will not be as effective if you don't have high explosion, like you can just gun powder it's not going to be good bomb. But if you put nitroglycerin on it, stable it up, that's it."

*See* U.S. Brief at 6–7(emphasis supplied). Defendant also told an informant, "I said 'knowledge is power' and just in case somebody pushes me to the limits." *Id.* at 7 n. 1. Furthermore, the post-arrest evidence found at the defendant's home pursuant to a search warrant is significant. The government found:

- one 9 millimeter Beretta handgun bearing serial number BER341463 with one magazine containing 58 rounds of ammunition;

- one Mossberg 12 gauge shotgun, bearing serial number P380768;

- one Beretta 9 millimeter CX4 Storm rifle, bearing serial number CX02876; and

- one Model S9/66 Yugo rifle, bearing serial number 151946.

In addition, the following items were also found at defendant's residence, among other things:

- 22 caliber pellet gun with a brown handle;

- two boxes of Wolf ammunition;

- one leather pouch with speed strip with 10 7.62 millimeter rounds of ammunition; and

- one bayonet.

It is telling that the four (4) guns found at defendant's home were used in the Pocono training in January and February, 2007.

*Summary*

After reviewing the totality of the evidence, the Court has reached the inescapable conclusion that the government has proved by a preponderance of the evidence that no condition or combination of conditions exist that will reasonably assure the defendant's appearance at trial. The defendant faces serious criminal charges that arise in the context of an alleged terrorist plot to attack Fort Dix. The defendant faces a potential ten-year prison sentence and involuntary deportation. The defendant does not have permanent and long-standing ties to this area, he has the means and incentive to flee and he has family ties and a place to live in an oversees country that will not extradite him to the United States.

It is just as clear that the government has proved by clear and convincing evidence that no condition or combination of conditions exist that will reasonably assure the safety of the community. Strong evidence exists to show that defendant supplied and stored firearms and bought ammunition for the other charged individuals, and he also trained them on how to use firearms. In addition, defendant knew the individuals he was assisting were involved in planning a dangerous scheme with potential deadly consequences. Furthermore, the defendant is an experienced firearms user with knowledge of how to make explosives. In addition, a transcript of defendant's recorded conversation shows

the defendant would be willing to use his home made explosives "if somebody turns against [him]...." Defendant also knowingly associated and assisted individuals who he had to have known were very dangerous. In short, this Court believes that if released the defendant will have the same means, motive and propensity to engage in dangerous illegal activity as he had before his arrest.

Based on all the foregoing, the Court finds that detention is appropriate and has entered an appropriate detention order.